JUDGE KAPLAN

15 CV          003

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------x

LESLIEANN MANNING,

                Plaintiff,

v.

**PATRICK GRIFFIN**, Superintendent, Sullivan Correctional
Facility;
**MARK ROYCE**, Deputy Superintendent for Security,
Sullivan Correctional Facility;
**PETER COHEN**, Instructor, Sullivan Correctional Facility;
**JOHN DOE I**, Correctional Sergeant, Sullivan Correctional
Facility;
**JOHN DOE II**, Correctional Officer, Sullivan Correctional
Facility,

                Defendants.

--------------------------------------------------------------------x

**COMPLAINT**

Civil Action No.15 CV 003
Jury Trial Demanded

Judge Lewis A. Kaplan



RECEIVED
JAN - 5 2015
U.S.D.C. S.D. N.Y.
CASHIERS

## PRELIMINARY STATEMENT

1.      LeslieAnn Manning is a transgender female who has been incarcerated at various

men's maximum-security facilities for more than two decades. While working her shift as an

Inmate Program Associate at Sullivan Correctional Facility ("Sullivan"), Ms. Manning was

brutally raped[1] in an inadequately supervised, unmonitored classroom by another prisoner, with a

history of violent behavior. The Defendants, responsible for prisoner safety and security, were

---

[1]   The term "rape" will be used in this Complaint to refer to the sexual assault that Ms. Manning suffered in
February of 2013. The Prison Rape Elimination Act ("PREA") defines rape as: "the carnal knowledge, oral
sodomy, sexual assault with an object, or sexual fondling of a person, forcibly or against that person's will."
Prison Rape Elimination Act of 2003, PL No. 108–79, 117 Stat 972. The federal government has similarly
expanded its definition of rape in compiling crime statistics; its updated definition includes forcible oral or anal
penetration of a person of any gender. FBI, *UCR Program Changes Definition of Rape: Includes All Victims and
Omits Requirement of Physical Force*, (Mar. 2012), http://www.fbi.gov/about-us/cjis/cjis-link/march-2012/ucr-
program-changes-definition-of-rape. In addition, the Supreme Court has used the term "rape" to refer to the
sexual assault of a transgender prisoner by another inmate while housed in a male facility. *Farmer v. Brennan*,
511 U.S. 825, 830 (1994).

deliberately indifferent to the heightened safety risks Ms. Manning faced as a transgender female in a men's prison. Defendants were aware of both the general risk that transgender female prisoners face in men's prisons, as well the certain specific risks that Ms. Manning faced at Sullivan. Defendants knew that the unmonitored area where Ms. Manning's program assignment took place was dangerous and that she, as a transgender prisoner, was at very high risk of sexual violence, yet they consciously disregarded the known risk to her safety. Furthermore, Defendants were no doubt aware of the Prison Rape Elimination Act, which was passed in 2003 in part to protect transgender prisoners from well-documented and pervasive sexual violence in confinement facilities. Sullivan officials failed to protect Ms. Manning from this vicious attack and were deliberately indifferent to her vulnerable situation.

2.      Since the time of the rape, Ms. Manning has experienced constant fear and anxiety. In spite of taking psychiatric medication, she finds it difficult to interact with others. Because of ongoing fear for her safety, she is housed in protective custody with extremely limited access to programming. She still wakes up in a cold sweat, screaming and terrified.

3.      Ms. Manning seeks relief under the Eighth Amendment, as Defendants knew she faced a substantial risk of harm and were deliberately indifferent to that risk. They failed to take reasonable measures to prevent harm to Ms. Manning, including allowing isolated sublevels of the prison to remain unmonitored for most of the day and particularly at times when they knew Ms. Manning worked in that area. As a result of defendants' deliberate indifference to Ms. Manning's safety, she was raped at Sullivan.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(3) and because the matters in controversy arise under 42 U.S.C. § 1983.

5.      Venue properly lies in this District pursuant to 28 U.S.C. § 1391(b)(2), because the events giving rise to this cause of action occurred at Sullivan Correctional Facility, located in the town of Fallsburg in Sullivan County, which lies within the Southern District of New York.

## PARTIES

6.      Plaintiff LeslieAnn Manning is and was, at all times relevant hereto, a prisoner in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Ms. Manning was incarcerated at Sullivan Correctional Facility at all times relevant to this incident.

7.      Defendant Patrick Griffin is and was, at all times relevant hereto, Superintendent of Sullivan Correctional Facility. As Superintendent, Defendant Griffin is directly responsible for enforcing general security policies and authorizing and managing the policies, procedures and customs governing day-to-day security. Additionally, Defendant Griffin is responsible for the assignment and removal of staff, the training of staff and the supervision of staff and prisoners to ensure a safe environment. Defendant Griffin is sued in his individual capacity.

8.      Defendant Deputy Superintendent Mark Royce is and was, at all times relevant hereto, a Deputy Superintendent for Security at Sullivan Correctional Facility. As Deputy Superintendent for Security, Defendant Royce was responsible for the supervision of staff and prisoners to ensure a safe environment, including the enforcement of DOCCS rules and

regulations.  Defendant Royce was also responsible for decisions concerning assignment of staff.

Defendant Royce is sued in his individual capacity.

9.       Defendant John Doe No. 1 was, at all times relevant hereto, a Correctional

Sergeant assigned to Sullivan.  On February 5, 2013, and at the time of Ms. Manning's rape, he

was the Sergeant assigned to the program area that included Sublevel E.  As such, he was

responsible for supervising the officers and prisoners in his area, making sure that officers

followed the rules and regulations and attended to their job duties.  He was also responsible for

conducting rounds of the area and reading area log books to make sure that they were being

administered accurately.  He was also responsible for making visual inspections of the area to

ensure that prisoners were in compliance with rules and standards, behaving appropriately, safe

and secure.  Defendant John Doe No. 1 is being sued in his individual capacity.

10.      Defendant John Doe No. 2 is and was, at all times relevant hereto, a correctional

officer assigned to Sullivan.  As such, he was responsible for the safety and security of the

prisoners confined therein.  Upon information and belief, Defendant John Doe is a Caucasian

male, approximately five feet and ten inches tall, and weighed about 200 pounds at the time of

the assault in February of 2013.  He also consistently smelled of cigars.  At the time of the

assault he was assigned to patrol Sublevel E.  Defendant John Doe No. 2 is being sued in his

individual capacity.

11.      Defendant Peter Cohen is and was, at all times relevant hereto, an instructor at

Sullivan.  Defendant Cohen was responsible for programming and instruction of prisoners with

auditory and visual impairments.  Ms. Manning was assigned to work under Cohen as a clerk and assistant.  Defendant Cohen was responsible for assigning Ms. Manning administrative and support tasks during the working hours.  After she informed him of the lack of security on the sublevel in which they worked, Defendant Cohen still assigned her the task of bringing writing paper to a violent prisoner in an empty, unsupervised classroom. Defendant Peter Cohen is being sued in his individual capacity.

## STATEMENT OF FACTS

### LeslieAnn Manning's Background:

12.     LeslieAnn Manning is a transgender woman who has been in DOCCS custody since 1991.  Ms. Manning is and has at all times relevant to this litigation identified as a woman. As a young teenager, her family voluntarily committed her to a state facility because they were unable to understand her gender identity.  She has experienced constant abuse and harassment by her family and her peers because of her gender identity.

13.     Ms. Manning suffers from serious health problems, including HIV, chronic obstructive pulmonary disease, heart disease, chronic pain, hearing loss, and incontinence.  She requires adult diapers for daily use.  Her symptoms leave her frail, dizzy, and short of breath, rendering her particularly vulnerable to sexual predators.

14.     Since her incarceration, Ms. Manning has consistently fought to have her gender identity recognized and accommodated by DOCCS.  She legally changed her name to reflect her

true gender identity. For several years, she has received hormone therapy as the result of a lawsuit.[2]

15.     DOCCS is and has been at all times relevant to this case, fully aware of Ms. Manning's vulnerable status. Ms. Manning and advocates acting on her behalf have informed DOCCS in a variety of ways that she is a transgender woman.

16.     On October 29, 2012 Ms. Manning filed an Article 78 petition (Index No. 2012-00001144) and settled that case on April 9, 2013. In this suit, Ms. Manning challenged DOCCS' decision not to allow her to wear female underwear. The suit described Ms. Manning's history as a transgender woman, her feminine physical appearance, and her needs and vulnerabilities as a transgender woman in a men's prison. DOCCS was on notice of Ms. Manning's heightened vulnerability as a transgender woman in a men's prison as a result of the Article 78 litigation.

17.     As part of a settlement agreement, DOCCS officials agreed to let her have feminine undergarments. DOCCS also allows Ms. Manning to shower privately.

18.     Ms. Manning has presented as a woman while incarcerated, so DOCCS has known that she is at a heightened risk for sexual violence because of her gender identity. DOCCS has been providing Ms. Manning with female hormones and androgen blockers to feminize her body and bring her physical appearance into line with her female gender identity for several years. Individuals transitioning from male to female like Ms. Manning usually use estrogen supplements and androgen blockers to develop feminine characteristics. Effects vary among individuals but usually include smoother skin, reduction in hair all over the body,

---

[2]   *Manning v. Goord*, 05-CV-850F, 2010 U.S. Dist. LEXIS 20597 (W.D.N.Y. Mar. 8, 2010).

redistribution of fat, reduction in muscle mass for a more feminine appearance, and the development of breasts.[3]   Hormone therapy is not the only means of transition.  Gender-affirming attire and the use of preferred names and pronouns are necessary as well.  Effective treatment is essential to reducing the risk of suicide and self-mutilation associated with gender dysphoria.[4]

19.    While Ms. Manning was incarcerated at Auburn Correctional Facility, the Sylvia Rivera Law Project, an organization that advocates for transgender prisoners, wrote formal letters to Auburn Correctional Facility's Superintendent Burge in 2008 and 2009 informing him of the disproportionate risk of sexual violence that Ms. Manning faced as a transgender female prisoner in a men's facility. The letters stated that by denying her access to private showers, DOCCS was forcing Ms. Manning to forgo basic hygiene just to avoid sexual violence.

---

[3]    *Assessing Readiness for Hormones – Patient Considering feminizing hormones for transition from male to female,* Center of Excellence for Transgender Health, University of California, San Francisco, Department of Family and Community Medicine, http://transhealth.ucsf.edu/pdf/protocols/Sample_1_MTF.pdf (last visited October 21, 2014). The American Medical Association recognizes hormone replacement therapy as an effective and medically necessary form of therapeutic treatment for transgender individuals.  The World Professional Association for Transgender Health (WPATH) also recognizes that hormone replacement therapy is medically necessary.  While not all transgender individuals choose to undergo hormone replacement therapy, it is the most common treatment for transgender patients seeking to live in accordance with the gender that they identify with. *See WPATH Clarification on Medical Necessity of Treatment, Sex Reassignment, and Insurance Coverage in the U.S.A.*, WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH, HTTP://WWW.WPATH.ORG/UPLOADED_FILES/140/FILES/MED%20NEC%20ON%202008%20LETTERHEAD.PDF (last updated June 17, 2008). *See also American Medical Association House of Delegates Resolution 122 (A-08),* TRANSGENDER AT WORK PROJECT, http://www.tgender.net/taw/ama_resolutions.pdf (June 2008); *Primary Care Protocol for Transgender Patient Care,* Center of Excellence for Transgender Health, University of California, San Francisco, Department of Family and Community Medicine, April 2011, http://transhealth.ucsf.edu/trans?page=protocol-hormones (last visited April 27, 2014).

[4]    *Assessing Readiness for Hormones – Patient Considering feminizing hormones for transition from male to female,* Center of Excellence for Transgender Health, University of California, San Francisco, Department of Family and Community Medicine, http://transhealth.ucsf.edu/pdf/protocols/Sample_1_MTF.pdf (last visited October 21, 2014).

20.     The Sylvia Rivera Law Project later sent a letter informing Auburn Superintendent Harold Graham that Ms. Manning faced chronic sexual harassment at the hands of correctional officers, which became more severe after she asked to be placed in protective custody.

21.     Upon information and belief, letters sent by legal organizations on behalf of prisoners, such as those referenced above, are maintained by DOCCS in the prisoner's file that that is transferred along with the prisoner each time she is moved to a different DOCCS prison.

22.     Pre-dating and during her incarceration at Sullivan, Ms. Manning had long hair and wore feminine undergarments including a bra; Sullivan staff and prisoners knew her as female.

23.     When Ms. Manning arrived at Sullivan Correctional Facility on August 21, 2012, Superintendent Griffin and other DOCCS officials were aware that she is a transgender woman. Upon information and belief, her file was replete with paperwork related to her transgender identity, including letters from the Sylvia Rivera Law Project detailing the risks she faces as a transgender prisoner and a letter from Cornell Law School's Advocacy for LGBT Communities Clinic dated December 7, 2012, all received months before the rape.

24.     At all times prior to being raped, Ms. Manning was housed in general population at Sullivan.  After she arrived at Sullivan, Ms. Manning was assigned to work as an Inmate Program Associate under instructor Peter Cohen.  She worked in this job for about 6 months.  In this position, she typed letters for the blind, made coffee for the hearing and sight impaired,

assisted the deaf and visually impaired with math, and assisted with handing out supplies, such as paper and writing implements.

25.    Ms. Manning's position as an Inmate Program Associate required her to work in Sublevel E, an area of the facility off a main corridor with five rooms aligned down a hallway. The sublevel contained classrooms and an administrative office. The classrooms were used for programming and instruction for prisoners with disabilities.  In addition, classrooms in Sublevel E were also used for Sex Offender program meetings, a deliberate disregard of the notice Defendants had about heightened security risks to transgender prisoners.  The end classroom in which the assault occurred had a door with a narrow window looking into the room.  At the time of the rape, the door was open but Ernest Williams and Ms. Manning were not in the line of vision of the open door.

26.    Prisoners could walk in and out of Sublevel E at will.  At some point prior to the incident, Ms. Manning told her supervisor, Peter Cohen, that the prisoners could enter and exit Sublevel E because the entrance was usually unlocked, as was the end classroom where the incident took place.  She told Cohen that there was not enough control over the area, as anyone could walk through.  Prisoners would come and linger there, resulting in a high noise volume in Sublevel E.  Upon information and belief, at the time of the assault, John Doe No. 2, a corrections officer, was responsible for patrolling the area.  There was a log book present on the sublevel that Officer Doe would sign to indicate that he walked through the area.  He would typically sign the log book at approximately 9 a.m. and remain in the area for a couple of minutes.  John Doe did not always return to patrol Sublevel E in the afternoon and thus did not always sign the log book during afternoon hours.

27.     On February 5, 2013 at approximately 1:15 p.m., while Ms. Manning was working her shift as an Inmate Program Associate, her supervisor, Mr. Cohen, asked her to take paper to a prisoner who was sitting alone in a classroom.  Ms. Manning complied with the request, unaware of the prisoner's identity.

28.     February 5, 2013 was a particularly busy day in Sublevel E.  That morning, there had been between twelve and thirteen prisoners in Classroom 3, where Cohen's office was located.  That afternoon, Cohen was in his office with six prisoners.  Cohen was the only staff in the area at the time.

29.     When Ms. Manning entered the room, Williams was off to the side and out of her view.  She went into the classroom and handed Williams the paper. She told him, in sum and substance: "Here is your paper."  Before she could leave, Williams approached her from behind, grabbing her neck with such force that she was unable to scream or resist.  He used his other hand to pull down her pants and adult diaper and raped her by penetrating her from behind. After releasing her from his grip, he said that that if she told anyone, he would kill her.

30.     Ms. Manning immediately went and told Mr. Cohen that she felt ill and was going back to her cell for the day.  In shock, Ms. Manning did not tell Mr. Cohen about the vicious assault she had just experienced.  Ms. Manning went straight to her cell and did not leave for dinner or for her nightly medication.

31.     Physically battered and traumatized, Ms. Manning contemplated suicide the evening of the incident.  Deciding against it, she saved the diaper with evidence of the assault in a plastic bag.

32.     The next day, February 6, 2013, Ms. Manning did not go to her job assignment. She stayed in her cell for the entire day.  She was afraid and experienced aching in her neck and pain and bleeding from her anus.

33.     On February 7, 2013, Cohen called an officer on Ms. Manning's block three times to make sure she would attend a mobility guide training session for prisoners learning to assist the blind.  Though she was physically and mentally unwell following the assault, Ms. Manning attended the training session.  She hid the marks on her neck from the assault out of fear and shame.

34.     Later that day, Ms. Manning decided to report the rape and asked the librarian to call her inmate counselor.  When the librarian could not reach the counselor, Ms. Manning told the librarian about the incident.

35.     Upon information and belief, the librarian told either the counselor or someone else about Ms. Manning's assault and shortly thereafter a sergeant and correctional officer came to interview her.

36.     Ms. Manning was taken across the hall to a room where the sergeant and correctional officer asked her what happened.  They then called her block to seal both her cell and Williams' cell.

37.     Upon information and belief, at some point after this, Ms. Manning's cell was searched to get the adult diaper brief she wore at the time of the incident.  The diaper was recovered from her cell and taken to the hospital for testing.  Her cell was again sealed.

38.     Ms. Manning was then taken to Sullivan's medical unit where Captain Stephen Urbanski met her.  Two correctional officers came in with cameras and took pictures of her. These officers also took her clothes and bagged them for evidence even though she kept telling the officers those weren't the clothes she was wearing during the assault.  This experience was extremely painful and humiliating for Ms. Manning.

39.     Ms. Manning was then taken to the Catskill Regional Medical Center, arriving at approximately 5:00 p.m., according to medical records.  She was examined by forensic nurse Marina Deluca and two doctors.  The medical professionals responsible for her examination found that Ms. Manning exhibited signs of a sexual assault, including bruising on her neck and abrasions around her anus.  According to medical records, the hospital collected a rape kit and turned it over to Investigator Justin Pinze at approximately 7:20 p.m.  Ms. Manning returned to Sullivan that night at approximately 9:45 p.m.

40.     Upon information and belief, the DNA collected was eventually matched to Ernest Williams. The next morning, February 8, 2013, Ms. Manning was approached by the Hospital Sergeant at Sullivan with a form that would permit her to be transferred to protective custody and advised her that she should consent to being transferred.  Fearing for her safety, she signed the form and was transferred to protective custody.

41.    In March or April of 2013, she signed out of protective custody because she learned that Ernest Williams had been transferred and thought she would be safe again in general population.  However, she soon concluded that general population was not safe because another prisoner, Joe Sullivan, called her a "rat" for reporting the assault and naming Williams as the rapist.  As a result of a general awareness among other prisoners of the assault, Ms. Manning feared for her safety and became very withdrawn.  As a result, she attempted to sign back into protective custody but was transferred to Clinton Correctional Facility before she could be placed there.

42.    Ms. Manning was transferred to Clinton Correctional Facility on April 25, 2013.

43.    Ms. Manning is currently housed in protective custody at Clinton Correctional Facility.  The sexual assault has impeded her ability to positively interact with other prisoners and with staff.  She still frequently wakes up in the middle of the night racked by nightmares, a racing heart, and in sweats.  Following the assault, Ms. Manning reports experiencing these symptoms 4-7 nights per week and that many of them persist.  She is prescribed Zoloft for some of these symptoms in addition to Trazodone for sleep and depression.  Her Zoloft dosage was raised after the rape in order to remedy her exacerbated symptoms.

### Defendants Were on Notice of the Risk of
### Housing Ms. Manning with a Sexual Predator

44.    Upon information and belief, Williams was transferred to Sullivan Correctional Facility after sexually assaulting another prisoner at Woodbourne Correctional Facility.  Though

a known sexual predator, Williams was housed in the same block, D North, as Ms. Manning, a prisoner who is a member of a targeted and particularly vulnerable prison population.

45.     Upon information and belief, Williams had a reputation of engaging in threatening and harassing behavior.

46.     Prior to the assault, Ms. Manning avoided contact with Williams because the day following her arrival at Sullivan, Williams exposed himself to her in a harassing manner.  She did not report the incident because she is frequently harassed and it would be impractical to report every such occurrence.

47.     Defendants acted with deliberate indifference to the safety of Ms. Manning by allowing a sexual predator not only to reside in the same block as a transgender female but also to occupy an unmonitored area near where she was assigned to work.

48.     Upon information and belief, Ernest Williams had sexually abused a prisoner at Woodbourne Correctional Facility and his status as a sexual predator was the reason for his transfer from Woodbourne to Sullivan.

49.     At some point after the rape, Martin Fairhurst, a fellow prisoner at Sullivan Correctional Facility, informed Ms. Manning that Ernest Williams had sexually assaulted him on numerous occasions, both before and after Ms. Manning's rape.  Upon information and belief, DOCCS lodged disciplinary charges against Ernest Williams for one or more of his assaults on Martin Fairhurst.

50.     Upon information and belief, DOCCS disciplined Ernest Williams for his sexual assault of Ms. Manning by placing him in solitary confinement.

### Defendants Were On Notice of Ms. Manning's Heightened Vulnerability to Sexual Assault as a Transgender Woman

51.     In addition to the specific risks involving Ms. Manning and the unmonitored sublevel where she was raped, Sullivan officials, including the Defendants, knew of the heightened safety risks surrounding transgender prisoners generally.  In 2003, Congress passed the Prison Rape Elimination Act ("PREA") in response to the documented pervasiveness of sexual violence in confinement settings.  The statute required that the Department of Justice ("DOJ") issue binding national standards to assist in the prevention and response to sexual violence.  *See* Prison Rape Elimination Act of 2003, Pub. L 108-79, codified at 42. U.S.C. § 15601, *et seq.*

52.     Following PREA's passage in 2003, the Prison Rape Elimination Commission ("the Commission") was formed to research the changes needed to ensure the safety of all prisoners from sexual violence.  The PREA Commission issued its final report in June 2009.  The Report found that male-to-female transgender individuals are at a heightened risk of experiencing sexual assault in prisons.[5]  Furthermore, the Report recommended that corrections administrators improve their capacity to identify vulnerable populations and protect them accordingly.[6]  All related findings noted the vulnerabilities of particular groups in confinement, including additional safety precautions for lesbian, gay, bisexual, and transgender (LGBT) prisoners, due to the high incidences of sexual assault they experience.  Specifically, the 2009

---

[5]   THE PRISON RAPE ELIMINATION COMMISSION, NATIONAL PRISON RAPE ELIMINATION REPORT 73 (2009).
[6]   *Id.* at 7.

15

PREA Commission Report states that "research on sexual abuse in correctional facilities consistently documents the vulnerability of men and women with non-heterosexual orientations and transgender individuals."[7]

53.      Defendants have long been aware of the heightened risks transgender prisoners face in men's correctional facilities. Twenty years ago, when faced with a similar case involving the rape of a transgender prisoner by another prisoner, the Supreme Court of the United States recognized the obvious danger that transgender prisoners face.[8]  In *Farmer*, the Court found that prisons have a duty to protect prisoners from violence at the hands of other inmates.  It also held that prison officials violate prisoners' constitutional guarantee of basic safety when they know of a significant risk of harm and fail to take reasonable measures to protect them.[9]  This clearly established law placed defendants on notice of their basic duties under the Constitution.  The defendants' failure to act in light of their knowledge of the law and the risk to Ms. Manning's safety demonstrates deliberate indifference under the Eighth Amendment.

54.      Before the February 5th, 2013 rape, it was widely known and discussed both inside and outside the correctional community that LGBT and gender nonconforming prisoners are among the groups with the highest rates of sexual victimization in prisons and jails.  For example, the Bureau of Justice Statistics ("BJS"), the Department of Justice,[10] and the National

---

[7]   *Id.*
[8]   *Farmer v. Brennan*, 511 U.S. 825 (1994).
[9]   *Id.* at 842.
[10]  BJS, SEXUAL VICTIMIZATION IN PRISONS AND JAILS REPORTED BY INMATES 2011-12, NATIONAL INAMTE SURVEY, 2011-12 (2013).

Institute of Corrections[11] have both noted publicly that LGBT prisoners are particularly vulnerable to sexual abuse while incarcerated.

55.     Information detailing DOCCS's lack of sufficient procedure and training for the safety of transgender prisoners has been publicized in recent years.  In 2007, the Sylvia Rivera Law Project published a report that unveiled the violence and discrimination transgender prisoners face in New York State prisons.[12]  The report included narratives from transgender prisoners discussing the physical and sexual abuse they endured at the hands of other prisoners, correctional officers, and other prison staff.[13]  Upon information and belief, the Sylvia Rivera Law Project presented this report to various DOCCS officials, including the Commissioner and various superintendents.  Moreover, the report was posted on the National Institute of Corrections' webpage.  Defendants knew of the safety risks surrounding a physically frail transgender female prisoner with chronic medical problems like Ms. Manning in a men's prison.  Despite actual knowledge that sexual violence was likely to occur, Defendants acted with deliberate indifference to Ms. Manning's safety by allowing her to work in an area with inadequate supervision and classrooms that, upon information and belief, were freely accessible to other prisoners.

56.     The Sylvia Rivera Law Project's report found that "every person who was interviewed reported encountering some form of harassment and/or assault during their imprisonment.  The persistent physical, emotional, and sexual abuse reported included verbal

---

[11]  NICIC, *Lesbian, Gay, Bisexual, Transgender and Intersex Offenders, available at* http://nicic.gov/lgbti (last visited Nov. 11, 2014). .

[12]  SYLVIA RIVERA LAW PROJECT, "IT'S A WAR IN HERE": A REPORT ON THE TREATMENT OF TRANSGENDER AND INTERSEX PEOPLE IN NEW YORK STATE MEN'S PRISONS (2007).

[13]  *Id.* at 17.

harassment, physical and sexual assault, humiliation, and rape."[14]  The report also notes that transgender prisoners face constant harassment at the hands of other prisoners.[15]

57.     A 2007 study from the University of California, Irvine found that, in the California prison system, transgender prisoners report more sexual assault by a factor of 13.4 compared to the non-transgender prisoners (59% to 4.4%).[16]  The Bureau of Justice Statistics noted in May, 2013 that all of the BJS victim self-report surveys conducted under PREA found that prisoners with the highest rates of sexual victimization are those who identified as LGBT.[17]

58.     In response to an increased awareness of the significant risk of harm transgender prisoners face in male facilities, detainment policies throughout the country have been modified to provide for the safety of transgender prisoners.   For example, in June 2012, the Denver Sheriff Department implemented a directive in response to PREA regulations that established guidelines to facilitate the elimination of discrimination against and provide for the safety, security and medical needs of transgender and gender-variant prisoners.[18]  The policy specifically provides for the establishment of a Transgender Review Board that is responsible for making decisions regarding the health and safety of transgender prisoners.   Furthermore, the policy requires the Board to convene seventy-two hours after a transgender prisoner is identified

---

[14]  *Id.* at 19.
[15]  *Id.* at 25.
[16]  JENNESS, MAXSON, MATSUDA & SUMNER, VIOLENCE IN CALIFORNIA CORRECTIONAL FACILITIES: AN EMPIRICAL EXAMINATION OF SEXUAL ASSAULT 31 (2007). *available at* http://www.wcl.american.edu/endsilence/documents/ViolenceinCaliforniaCorrectionalFacilities.pdf.
[17]  U.S. DEPARTMENT OF JUSTICE, OFFICE OF JUSTICE PROGRAMS, BUREAU OF JUSTICE STATISTICS, SEXUAL VICTIMIZATION IN PRISONS AND JAILS REPORTED BY INMATES, 2011-2012, AT 31, *available at* http://www.bjs.gov/content/pub/pdf/svpjri1112.pdf. *See also* JODY MARKSAMER, HARPER JEAN TOBIN, STANDING WITH LGBT PRISONERS: AN ADVOCATE'S GUIDE TO ENDING ABUSE AND COMBATING IMPRISONMENT, NATIONAL CENTER FOR TRANSGENDER EQUALITY 3 (2013).
[18]  DENVER SHERIFF DEP'T, OFFICE OF THE DIR. OF CORR./UNDERSHERIFF, DEP'T ORDER 4005.1 TRANSGENDER AND GENDER-VARIANT INMATES (2012), *available at* https://s3.amazonaws.com/static.nicic.gov/Library/026337.pdf.

as such to determine the prisoner's "medical, psychological, and housing needs."[19]  A similar policy was implemented by the Harris County, Texas Sheriff's Department in 2013.[20] Specifically, the policy requires that "All inmates, within 72 hours of arrival at a HCSO detention facility, shall be assessed for their risk of being sexually abused by ... other inmates in compliance with PREA standards."[21]

59.    In May 2013, DOCCS updated Health Directive 1.31, which lays out the policies for prisoners to be diagnosed with "Gender Identity Disorder" and to obtain hormones and state-issued bras.  The directive also states, "It is the policy of the New York State Department of Corrections and Community Supervision to recognize that Gender Identity Disorder (GID) is a psychiatric diagnosis."[22] This policy change shows that DOCCS was aware of the issues transgender prisoners face and the need to change policies to conform to their specific needs.

60.    Upon information and belief, Patrick Griffin was responsible for supervising the care, custody and control of all prisoners in Sullivan.  Superintendent Griffin was on notice of the particular dangers transgender females face when housed in male facilities like Sullivan. Prior to Ms. Manning's rape, the Sylvia Rivera Law Project sent the Superintendents of Auburn and Sullivan numerous letters that specifically expressed that transgender women are extremely vulnerable in male prisons and are at an increased risk of sexual violence and victimization. Furthermore, prior to Ms. Manning's rape, the Sylvia Rivera Law Project sent advocacy letters to Auburn Correctional Facility during the time Ms. Manning was housed there specifically alerting

---

[19]  *Id.* at 5.
[20]  HARRIS CNTY. SHERIF DEP'T, POLICY NO. 413 (2013) *available at*
      http://www.harriscountyso.org/documents/PREA/HCSO_LGBTI_Policy.pdf.
[21]  *Id.* at 6.
[22]  N.Y. STATE DEP'T OF CORR. AND CMTY. SUPERVISION , DEP'T OF HEALTH SERV., POLICY: GENDER IDENTITY
      DISORDER 1.31 (2013), *available at* http://srlp.org/wp-content/uploads/2012/08/HSPM-1.31-May-20-2013-
      version.pdf.

Superintendent Graham of the harms that she faced as a transgender woman in a male correctional facility.  Upon information and belief, despite the fact that Ms. Manning's file was replete with information regarding the significant risk of harm she faced because of her gender identity, the security at Sullivan remained inadequate.  Upon information and belief, defendant Griffin knew about the routine lack of adequate supervision in the sublevel area where Ms. Manning was raped and was aware of Williams' history of sexual assaults.  Yet in spite of this information and his responsibilities, security remained inadequate and Ms. Manning was placed in harm's way.

61.    Upon information and belief, Mark Royce was in charge of providing for prisoner safety at Sullivan.  Upon information and belief, Deputy Superintendent Royce was informed of the especially dangerous situation of transgender female prisoners housed in male facilities, like Sullivan.  Upon information and belief, he was aware of the letters and advocacy requests sent from the Sylvia Rivera Law Project alerting the prison to these risks.  Furthermore, upon information and belief, Royce was responsible for ensuring that all areas of the prison were adequately monitored and had the means to verify that corrections officers patrolled all areas of the facility regularly.  Upon information and belief defendant Royce knew about the routine lack of adequate supervision in the sublevel area where Ms. Manning was raped and was aware of Williams' history of sexual assaults.  Yet in spite of this information and his responsibilities, security remained inadequate and Ms. Manning was placed in harm's way.

## <u>CAUSE OF ACTION</u>
## CLAIM FOR RELIEF FOR DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983 AGAINST ALL DEFENDANTS

62.     Ms. Manning incorporates by reference all previous paragraphs of this Complaint as if fully set forth here.

63.     Defendants, acting under color of state law, deprived Plaintiff of the rights, privileges, and immunities guaranteed to citizens of the United States by the Eighth and Fourteenth Amendments to the United States Constitution and in violation of 42 U.S.C. § 1983 by failing to take reasonable security precautions which resulted in substantial harm to Ms. Manning.

64.     Defendants' unreasonable practice of allowing prisoners to roam around an inadequately monitored sublevel and disregard for Ms. Manning's obvious and substantial risk of harm as a transgender prisoner with other chronic health problems that left her physically frail, amounted to deliberate indifference to Plaintiff's safety.

65.     Despite Defendants' notice that, as a transgender woman, Ms. Manning was highly vulnerable to sexual violence, she suffered serious injury in violation of her right to be free from cruel and unusual punishment.

## DEMAND FOR RELIEF

**WHEREFORE, Plaintiff LeslieAnn Manning respectfully requests judgment against Defendants as follows:**

(A)     A declaration that Defendants violated the Civil Rights Act of 42 U.S.C. § 1983 and the Eighth Amendment of the United States Constitution by being deliberately indifferent to the heightened vulnerability of Plaintiff;

(B)     An order awarding compensatory punitive damages against Defendants, in an amount to be determined at trial;

(C)     Reasonable attorneys' fees and costs under 42 U.S.C. § 1988;

(D)     Directing such other and further relief as the Court may deem just and proper, together with attorneys' fees, interest, cost, and disbursements of this action.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff LeslieAnn Manning hereby demands trial by jury on all claims asserted in the above complaint.

Dated: New York, NY
       January 5, 2015

BETSY GINSBERG, ESQ.
CARDOZO CIVIL RIGHTS CLINIC
Attorney for Plaintiff
Benjamin N. Cardozo School of Law
55 5th Avenue, 11th Floor
New York, NY 10003
(212) 790-0871
Betsy.ginsberg@yu.edu

ELIAS SHEBAR
FRANCESCA ACOCELLA
*Legal Interns*

SUSAN HAZELDEAN, ESQ.
CORNELL LGBT CLINIC
Attorney for Plaintiff
Cornell Law School
149 Myron Taylor Hall
Ithaca, NY 14853
(607) 254-4765
shazeldean@cornell.edu

ZACHARY DUGAN
TONY PEI ZHAO
*Legal Interns*