UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LESLIEANN MANNING,

Plaintiff,

v.

PATRICK GRIFFIN, et al.,

Defendants.

No. 15-CV-3 (KMK)

OPINION AND ORDER

Appearances:

Betsy R. Ginsberg, Esq.
Cardozo Law – Immigration Justice Clinic
New York, NY
*Counsel for Plaintiff*

Susan V. Hazeldean, Esq.
Cornell Law School Clinical Program
Ithaca, NY
*Counsel for Plaintiff*

Maria B. Hartofilis, Esq.
Attorney General of the State of New York
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

Plaintiff LeslieAnn Manning ("Plaintiff") brings the instant Amended Complaint

pursuant to 42 U.S.C. § 1983 against Superintendent Patrick Griffin, Deputy Superintendent

Dennis Giglio, Captain Stephen Urbanski, Sergeant Brian Barlow, Correctional Officer Daniel

Ladenhauf, and Peter Cohen (collectively, "Defendants"), alleging violations of her

constitutional rights based on Defendants' failure to protect her from a sexual assault that

occurred at Sullivan Correctional Facility.  (Am. Compl. (Dkt. No. 14).)  Before the Court is

Defendants' Motion To Dismiss the Amended Complaint (the "Motion").  (Dkt. No. 20.)  For the

following reasons, Defendants' Motion is granted and Plaintiff's Amended Complaint is

dismissed, without prejudice.

I.  Background

A.  Factual Background

The following facts are drawn from Plaintiff's Amended Complaint and are taken as true

for the purpose of resolving the instant Motion.

1.  The Parties

At all times relevant to this case Plaintiff was incarcerated at Sullivan Correctional

Facility ("Sullivan").  (Am. Compl. ¶ 6.)  Plaintiff is a transgender woman who has been

incarcerated at various men's maximum-security facilities for more than two decades.  (*Id.* ¶¶ 1,

12.)[1]  Plaintiff suffers from serious health problems, "including HIV, chronic obstructive

pulmonary disease, heart disease, chronic pain, hearing loss, and incontinence [and] requires

adult diapers for daily use."  (*Id.* ¶ 13.)  Plaintiff's various medical issues leave her "frail, dizzy,

and short of breath."  (*Id.*)  Plaintiff "has consistently fought to have her gender identity

recognized and accommodated by [the New York State Department of Corrections and

Community Supervision ("DOCCS")]."  (*Id.* ¶ 14.)  She legally changed her name to reflect her

gender identity and has received hormone therapy for several years.  (*Id.*)

DOCCS has been providing Plaintiff with female hormones and androgen blockers "to

feminize her body and bring her physical appearance into line with her female gender identity."

(*Id.* ¶ 18.)  Plaintiff "has presented as a woman while incarcerated," (*id.*), and both before and

---

[1] There are no allegations that Plaintiff was the victim of any inmate-on-inmate assaults
prior to the one alleged in the Amended Complaint that is the subject of this Action.

during her incarceration at Sullivan, Plaintiff "had long hair and wore feminine undergarments including a bra," (*id.* ¶ 22).

Patrick Griffin ("Griffin") is and was, at all times relevant, Superintendent of Sullivan. (*Id.* ¶ 7.)  In that role, Griffin is "directly responsible for enforcing general security policies and authorizing and managing the policies, procedures[,] and customs governing day-to-day security."  (*Id.*)  He is also responsible for "the assignment and removal of staff, the training of staff[,] and the supervision of staff and prisoners to ensure a safe environment."  (*Id.*)

Dennis Giglio ("Giglio") was, at all times relevant, a Deputy Superintendent for Security at Sullivan.  (*Id.* ¶ 8.)  In that role, Giglio was "responsible for the supervision of staff and prisoners to ensure a safe environment, including the enforcement of DOCCS rules and regulations."  (*Id.*)  Giglio's responsibilities also included "decisions concerning assignment of staff."  (*Id.*)

Stephen Urbanski ("Urbanski") is and was, at all times relevant, a Captain at Sullivan. (*Id.* ¶ 9.)  In that role, Urbanski was "responsible for overseeing sergeants and correctional officers and for investigating and responding to prisoners' complaints, including complaints regarding safety concerns."  (*Id.*)

Brian Barlow ("Barlow") was, at all times relevant, a Correctional Sergeant at Sullivan. (*Id.* ¶ 10.)  At the time Plaintiff was raped, Barlow was "the Sergeant assigned" to Sublevel E, the area where the rape occurred and, as such, "he was responsible for supervising the officers and prisoners in his area, making sure that officers followed the rules and regulations and attended to their job duties."  (*Id.*)  He was also "responsible for conducting rounds of the area and reading area log books," and for "making visual inspections of the area to ensure that

prisoners were in compliance with rules and standards, behaving appropriately, safe and secure." (*Id.*)

Daniel Ladenhauf ("Ladenhauf") is and was, at all times relevant, a correctional officer assigned to Sullivan, which meant that he "was responsible for the safety and security of the prisoners confined therein." (*Id.*)  At the time of the sexual assault, Ladenhauf "was assigned to patrol the D&E housing unit corridor," which meant that he was "the primary member of the security staff responsible for patrolling and general security in Sublevel E," where the rape occurred.  (*Id.*)

Finally, Peter Cohen ("Cohen") is and was, at all times relevant, an instructor at Sullivan, who was "responsible for programming and instruction of prisoners with auditory and visual impairments." (*Id.* ¶ 11.)  Plaintiff was assigned to work under Cohen as a "clerk and assistant" and Cohen was "responsible for assigning [Plaintiff] administrative and support tasks during the working hours." (*Id.*)

### 2.  Plaintiff's Arrival at Sullivan and the Sexual Assault

Plaintiff arrived at Sullivan on August 21, 2012 and was housed in general population. (*Id.* ¶¶ 23–24.)[2]  Plaintiff was assigned to work as an Inmate Program Associate under Cohen, which required her to work in Sublevel E, an area at Sullivan "off a main corridor with five rooms aligned down a hallway." (*Id.* ¶¶ 24–25.)  Plaintiff's duties included assisting the deaf and visually-impaired with various tasks, as well as assisting "with handing out supplies, such as paper and writing implements." (*Id.* ¶ 24.)

_____

[2] Plaintiff does not allege that she sought to be placed in protective custody or in any other housing situation besides general population.

On February 5, 2013, at approximately 1:15 P.M., while Plaintiff was working her shift as an Inmate Program Associate in Sublevel E, Cohen asked her to deliver a paper to a prisoner sitting alone in a classroom. (*Id.* ¶¶ 25, 27.) Unbeknownst to Plaintiff, the prisoner was Ernest Williams ("Williams"), her eventual attacker. (*Id.* ¶¶ 27, 29.) Plaintiff complied with Cohen's request and handed Williams the paper. (*Id.* ¶ 29.) Before she could leave, Williams approached her from behind, forcefully grabbed her neck with one hand, and used his other hand to pull down her pants. (*Id.*) He then "raped [Plaintiff] by penetrating her from behind." (*Id.*) After releasing her from his grip, he threatened to kill her if she reported the incident. (*Id.*)

Plaintiff reported the incident two days later and was eventually taken to Catskill Regional Medical Center, where medical professionals examined her and found that she exhibited signs of a sexual assault. (*Id.* ¶¶ 34, 39.) After returning to Sullivan, Plaintiff was transferred to protective custody, where she remained until March or April of 2013, when she was released back into general population at Sullivan, and then transferred to Clinton Correctional Facility, where she currently is housed in protective custody. (*Id.* ¶¶ 40–43.)

### 3. Defendants' Alleged Knowledge of Risks Faced By Plaintiff

Plaintiff's Amended Complaint contains a number of allegations aimed at supporting her claim that Defendants were aware that she faced a substantial risk of being sexually assaulted at Sullivan. These allegations can be divided into four categories: (1) allegations supporting the belief that, in general, transgender inmates are more likely to be sexually assaulted than other inmates; (2) allegations regarding the notification of certain Defendants that Plaintiff, as a transgender woman, was at risk of sexual assault; (3) allegations addressing the sexually violent proclivities of her attacker, Williams, who was housed in the same block as Plaintiff; and (4) allegations regarding a lack of supervision on Sublevel E, the area where Plaintiff was raped.

a.  Transgender Inmate Risks

Plaintiff alleges that "Defendants[] knew of the heightened safety risks surrounding transgender prisoners generally." (*Id.* ¶ 51.)  In support, Plaintiff cites to the Prison Rape Elimination Act ("PREA"), which required the Department of Justice to issue "national standards to assist in the prevention and response to sexual violence" in prisons. (*Id.*)  A commission that was formed following the passage of PREA issued a final report in 2009 that "found that male-female transgender individuals are at a heightened risk of experiencing sexual assault in prisons" and noted that "research on sexual abuse in correctional facilities consistently documents the vulnerability of men and women with non-heterosexual orientations and transgender individuals." (*Id.* ¶ 52 (internal quotation marks omitted).)  Plaintiff's Amended Complaint also cites to a number of reports and studies published by government entities such as the Bureau of Justice Statistics and the National Institute of Corrections which "have . . . noted publicly that LGBT prisoners are particularly vulnerable to sexual abuse while incarcerated." (*See id.* ¶¶ 54, 57.)

Specific to DOCCS, Plaintiff alleges that "[i]nformation detailing DOCCS's lack of sufficient procedure and training for the safety of transgender prisoners has been publicized in recent years." (*Id.* ¶ 55.)  Plaintiff cites to a report from the Sylvia Rivera Law Project, which "unveiled the violence and discrimination transgender prisoners face in New York State prisons," and which was "presented . . . to various DOCCS officials, including the Commissioner and various superintendents." (*Id.*)  Plaintiff also alleges that in May 2013, DOCCS "updated Health Directive 1.31, which lays out the policies for prisoners to be diagnosed with 'Gender Identity Disorder' and to obtain hormones and state-issued bras." (*Id.* ¶ 59.)  The directive also

6

states that "'[i]t is the policy of [DOCCS] to recognize that Gender Identity Disorder (GID) is a psychiatric diagnosis.'" (*Id.*)[3]

### b.  Letters Addressing Risks to Plaintiff

Plaintiff alleges that a number of letters regarding her safety were sent either by her or on her behalf to various prison officials.  (*See id.* ¶¶ 19–20, 65–66.)  Plaintiff alleges that when she was incarcerated at Auburn Correctional Facility, the Sylvia Rivera Law Project "wrote formal letters to Auburn Correctional Facility's Superintendent Burge in 2008 and 2009 informing him of the disproportionate risk of sexual violence that [Plaintiff] faced as a transgender female prisoner in a men's facility." (*Id.* ¶ 19.)  The same group later sent another letter informing Auburn Superintendent Harold Graham that Plaintiff "faced chronic sexual harassment at the hands of correctional officers." (*Id.* ¶ 20.)  Plaintiff alleges, "[u]pon information and belief," that "letters sent by legal organizations on behalf of prisoners, such as those referenced above, are maintained by DOCCS in the prisoner's file that . . . is transferred along with the prisoner each time she is moved to a different DOCCS prison." (*Id.* ¶ 21.)  Accordingly, Plaintiff further alleges that when she arrived at Sullivan on August 21, 2012, "her file was replete with paperwork related to her transgender identity," including the aforementioned letters from the Sylvia Rivera Law Project.  (*Id.* ¶ 23.)

After her transfer to Sullivan, Plaintiff wrote to Griffin regarding two incidents in which correctional officers "squeezed" Plaintiff's breasts during a search.  (*Id.* ¶¶ 63–65.)  Plaintiff alleges that Urbanski wrote a letter to her "concluding the investigation into this matter." (*Id.* ¶ 65.)  Finally, on December 7, 2012, the Cornell LGBT Clinic wrote to Griffin detailing the two

---

[3] The Amended Complaint also refers to changes made by the Denver Sheriff Department and the Harris County, Texas Sheriff's Department addressing the safety of transgender inmates. (Am. Compl. ¶ 58.)

incidents and "alerting him to the continuous harassment [Plaintiff] suffered at the hands of [c]orrectional [o]fficers, who were making degrading comments about her gender identity." (*Id.* ¶ 66.)  According to Plaintiff, the letter informed Griffin of "[her] fear that the gender-identiy [sic] based harassment by DOCCS employees would 'worsen and esacalate [sic] to the point of violence.'" (*Id.*)  Griffin responded to the Cornell LGBT Clinic on December 18, 2012 and stated that Urbanski was charged with investigating the matter and that Plaintiff's future concerns should be addressed to facility officials.  (*Id.* ¶ 67.)  However, "Griffin did not indicate any steps the facility had taken or would be taking to ensure [Plaintiff's] future safety . . . ." (*Id.*)

### c.  Plaintiff's Assailant

Plaintiff alleges, "[u]pon information and belief," that Williams—who was housed in the same block as Plaintiff—was transferred to Sullivan due to his sexual assault of another inmate at Woodbourne Correctional Facility, (*id.* ¶¶ 44, 48), and "had a reputation of engaging in threatening and harassing behavior," (*id.* ¶ 45).  Prior to the sexual assault of Plaintiff, Williams "exposed himself to her in a harassing manner," but she did not report the incident because she was frequently harassed and thought "it would be impractical to report every such occurrence." (*Id.* ¶ 46.)  After Plaintiff was sexually assaulted by Williams, a fellow inmate at Sullivan, Martin Fairhurst ("Fairhurst"), informed Plaintiff that Williams had sexually assaulted him on numerous occasions, "both before and after [Plaintiff's] rape." (*Id.* ¶ 49.)  "Upon information and belief," Plaintiff alleges that DOCCS lodged disciplinary charges against Williams "for one or more of his assaults on Fairhurst." (*Id.*)  Williams was placed in solitary confinement as punishment for his sexual assault of Plaintiff.  (*Id.* at ¶ 50.)

<u>d.  Sublevel E Supervision</u>

Plaintiff alleges that Sublevel E—the area where she worked and where she was raped—was "an area with inadequate supervision" and with "classrooms that . . . were freely accessible to other prisoners."  (*Id.* ¶ 55.)  More specifically, Sublevel E was an area at Sullivan "off a main corridor with five rooms aligned down a hallway."  (*Id.* ¶ 25.)  The area contained five classrooms which were used for programming and instruction for prisoners with disabilities, as well as for "Sex Offender program meetings."  (*Id.*)

Prisoners at Sullivan "could walk in and out of Sublevel E at will."  (*Id.* ¶ 26.)  At some point before she was sexually assaulted, Plaintiff told Cohen that prisoners could enter and exit Sublevel E because the entrance was usually unlocked and that there "was not enough control over the area, as anyone could walk through."  (*Id.*)  She further told him that prisoners "would come and linger there, resulting in a high noise volume."  (*Id.*)

Ladenhauf was responsible for patrolling Sublevel E.  (*Id.*)  He would typically sign a log book around 9 A.M. each morning, indicating that he walked through Sublevel E, and would remain in the area for a few minutes.  (*Id.*)  Ladenhauf "did not always return to patrol Sublevel E in the afternoon and thus did not always sign the log book during afternoon hours."  (*Id.*)

<u>B.  Procedural History</u>

Plaintiff filed the initial Complaint on January 5, 2015 against Griffin, Cohen, "Mark Royce," "John Doe No. 1," and "John Doe No. 2."  (Dkt. No. 1.)  The Court held a Pre-Motion Conference regarding a possible motion to dismiss on April 21, 2015.  (*See* Dkt. (minute entry for Apr. 21, 2015).)  The Court entered a Scheduling Order the same day.  (Dkt. No. 13.)

Pursuant to that Order, on May 20, 2015, Plaintiff filed the Amended Complaint against Griffin, Giglio, Urbanski, Barlow, Ladenhauf, and Cohen.  (Dkt. No. 14.)  Also pursuant to that

Order, Defendants filed their Motion To Dismiss the Amended Complaint on July 7, 2015.  (Dkt. Nos. 20–21.)  Plaintiff filed her memorandum of law in opposition to the Motion on July 31, 2015, (Dkt. No. 22), and Defendants filed their reply memorandum in further support of their Motion on August 31, 2015, (Dkt. No. 23).  The Court heard oral argument on the Motion on March 2, 2016.  (*See* Dkt. (minute entry for Mar. 2, 2016).)

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the 'grounds' of his [or her] 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (second alteration in original) (citations omitted).  Instead, the Supreme Court has emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.*, and that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563.  A plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570. But if a plaintiff has "not nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed."  *Id.*; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the

pleader is entitled to relief.'" (alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))).

For the purpose of resolving the Motion, the Court is required to consider as true the factual allegations contained in the Amended Complaint. *See Ruotolo v. City of N.Y.*, 514 F.3d 184, 188 (2d Cir. 2008) ("We review de novo a district court's dismissal of a complaint pursuant to Rule 12(b)(6), accepting all factual allegations in the complaint and drawing all reasonable inferences in the plaintiff's favor." (italics and internal quotation marks omitted)); *Gonzalez v. Caballero*, 572 F. Supp. 2d 463, 466 (S.D.N.Y. 2008) ("On a Rule 12(b)(6) motion to dismiss a complaint, the court must accept a plaintiff's factual allegations as true and draw all reasonable inferences in his [or her] favor."). "In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted).

### B.  Failure to Protect

#### 1.  Applicable Law

The Eighth Amendment, which prohibits cruel and unusual punishment, requires prison officials to "take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996); *see also Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (same).  Specifically, "[p]rison officials have a duty to protect prisoners from violence at the hands of other inmates since being violently assaulted in prison is 'simply not part of the penalty that criminal offenders pay for their offenses against society.'" *Lee v. Artuz*, No. 96-CV-8604, 2000 WL 231083, at *4 (S.D.N.Y. Feb. 29, 2000) (quoting

*Farmer*, 511 U.S. at 834).  Put another way, "[h]aving incarcerated persons with demonstrated proclivities for antisocial criminal, and often violent, conduct, having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Farmer*, 511 U.S. at 833 (citation, alterations, and internal quotation marks omitted).  However, "not . . . every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834.  Instead, "the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice." *Hayes*, 84 F.3d at 620; *see also Price v. Oropallo*, No. 13-CV-563, 2014 WL 4146276, at *8 (N.D.N.Y. Aug. 19, 2014) ("Prison officials are liable under the Eighth Amendment for harm incurred by an inmate if they act with deliberate indifference to the inmate's safety.").

To satisfy the deliberate indifference standard, a plaintiff must show that (1) "[s]he is incarcerated under conditions posing a substantial risk of serious harm," and (2) "the defendant prison officials possessed sufficient culpable intent." *Hayes*, 84 F.3d at 620 (citing *Farmer*, 511 U.S. at 834).  The first prong is objective and requires that prison officials provide inmates with "basic human needs, one of which is 'reasonable safety.'" *Helling v. McKinney*, 509 U.S. 25, 30, 33 (1993) (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199 (1989)).[4]  "The second prong of the deliberate indifference test, culpable intent, . . . involves a two-tier inquiry." *Hayes*, 84 F.3d at 620.  In particular, "a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he

---

[4] For purposes of the Motion, Defendants do not dispute that Plaintiff has satisfied the objective prong of the deliberate indifference test.  (*See* Mem. of Law in Supp. of Defs.' Mot. To Dismiss the Am. Compl. 8 (Dkt. No. 21).)

disregards that risk by failing to take reasonable measures to abate the harm." *Id.*  As the Supreme Court has made clear, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837; *see also Price*, 2014 WL 4146276, at *8 (explaining that to establish deliberate indifference, "a plaintiff must prove that the defendant official actually knew of and disregarded an excessive risk of harm to the plaintiff's safety").

The Supreme Court first expressly adopted the "actual knowledge" requirement for a deliberate indifference claim in *Farmer*.  *See* 511 U.S. at 837.  The facts of that case bear enough of a resemblance to those in the instant Action that the case warrants additional discussion.  The plaintiff in *Farmer* was a preoperative "transsexual who project[ed] feminine characteristics," who was beaten and raped after being transferred to a federal penitentiary.  *Id.* at 830–31.  The plaintiff brought a *Bivens* action against a number of federal prison officials, alleging a violation of the Eighth Amendment.  *Id.* at 830.[5]  After rejecting the plaintiff's argument in favor of an objective standard for deliberate indifference claims—in other words, a standard that would require only that the risk was either known or *should have been* known to prison officials—the Supreme Court provided guidance as to how plaintiffs can prove officials' actual knowledge of a risk.  *See id.* at 837–38, 840–42.  The Court's direction is helpful in considering Plaintiff's allegations.

First and particularly relevant here, *Farmer* makes clear that the knowledge prong of a deliberate indifference claim can be established through "inference from circumstantial evidence," *id.* at 842; *see also Dublin v. N.Y.C. Law Dep't*, No. 10-CV-2971, 2012 WL 4471306,

---

[5] "*Bivens* actions, although not precisely parallel, are the federal analog to § 1983 actions against state actors."  *Feldman v. Lyons*, 852 F. Supp. 2d 274, 279 (N.D.N.Y. 2012) (citing *Chin v. Bowen*, 833 F.2d 21, 24 (2d Cir. 1987)).

at *5 (S.D.N.Y. Sept. 26, 2012) ("Direct evidence that prison officials knew of and disregarded a serious risk of harm to a prison inmate will rarely be available, and therefore an inmate may rely on circumstantial evidence." (internal quotation marks omitted)), and that a "factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious," *Farmer*, 511 U.S. at 842; *see also Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003) ("Although *Farmer* requires that a plaintiff prove actual knowledge of a risk, evidence that the risk was obvious or otherwise must have been known to a defendant is sufficient to permit a jury to conclude that the defendant was actually aware of it.").  As an example, the *Farmer* Court explained that if a plaintiff provided evidence "showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past," and that "the circumstances suggest" that the defendant "had been exposed to information concerning the risk," then a factfinder may infer that the defendant had actual knowledge of the risk.  *Farmer*, 511 U.S. at 842–43 (internal quotation marks omitted).

The *Farmer* Court further explained that a defendant can possess knowledge of a substantial risk of harm to a plaintiff even if the plaintiff has not notified the defendant that she fears for her safety and she has not provided to the defendant an identification of a specific potential assailant.  *See id.* at 848 (explaining that "the failure to give advance notice" of a risk of harm "is not dispositive"); *see also Hayes*, 84 F.3d at 621 ("Although a prisoner's identification of his enemies is certainly relevant to the question of knowledge, it is not, necessarily, outcome determinative.").  Relatedly, the risk of attack may originate from "a single source or multiple sources," and may result from "reasons personal to [the plaintiff] or because all prisoners in his [or her] situation face such a risk."  *Farmer*, 511 U.S. at 843; *see also Warren v. Goord*, 579 F. Supp. 2d 488, 495 (S.D.N.Y. 2008) (same) (citing *Farmer*, 511 U.S. at 843).  Additionally, the

*Farmer* Court cited, with apparent approval, language from a party's brief noting that "a prisoner can establish exposure to a sufficiently serious risk of harm 'by showing that he belongs to an identifiable group of prisoners who are frequently singled out for violent attack by other inmates.'" *Farmer*, 511 U.S. at 843; *see also Lumumba v. Beyor*, No. 13-CV-81, 2014 WL 1516320, at *5 n.3 (D. Vt. Apr. 17, 2014) (noting that *Farmer* "suggest[s] that an inmate could show exposure to a sufficiently serious risk of harm if he proved that he belonged to an identifiable group of prisoners who are frequently singled out for violent attack by other inmates" (internal quotation marks omitted)).

The Supreme Court ultimately remanded the case back to the district court to resolve the knowledge issue, because the record did not clearly establish whether the defendants were aware of a substantial risk of harm to the plaintiff. *Farmer*, 511 U.S. at 848.[6] One of two pieces of evidence to which the Court expressly referred was the defendants' "admission that [the plaintiff] is a 'non-violent' transsexual who, because of [his] 'youth and feminine appearance' is 'likely to experience a great deal of sexual pressure' in prison." *Id.*[7]

### 2.  Application

Defendants argue that Plaintiff has failed to state a claim under the subjective prong of the deliberate indifference test because she "has failed to sufficiently allege that any . . . [D]efendants were aware of an actual risk of serious harm to [P]laintiff or a substantial and well-documented risk of sexual attacks at [Sullivan]."  (Mem. of Law in Supp. of Defs.'

---

[6] The underlying district court decision in *Farmer* was an order on a motion for summary judgment.  *See Farmer*, 511 U.S. at 831.

[7] The other fact was that the plaintiff recounted a statement by one of the defendants that conveyed to the plaintiff that "there was 'a high probability that [he] could not safely function at USP-Lewisburg.'"  *Farmer*, 511 U.S. at 848–49.

Mot. To Dismiss the Am. Compl. ("Defs.' Mem.") 8 (Dkt. No. 21).)  Defendants insist that "the

gravamen of [P]laintiff's argument is that because she is a transgender female, defendants *should*

*have known* of a substantial risk of serious harm to her."  (*Id.* at 9.)

Plaintiff, on the other hand, insists that she has adequately alleged each Defendant's

subjective awareness of a substantial risk that Plaintiff would be sexually assaulted.  Plaintiff

argues that the sources of that knowledge were:  "the obvious risk stemming from [the] fact that

she was a transgender woman in a men's prison; that Defendants knew that Sublevel E was

completely unmonitored by security staff; that Defendants were aware of [Williams'] history of

sexual violence; and the fact that [Plaintiff] and others, including her counsel, notified

Defendants in writing of her vulnerability to sexual assault."  (Mem. of Law in Supp. of Pl.'s

Opp'n to Defs.' Mot. To Dismiss ("Pl.'s Opp'n") 1 (Dkt. No. 22); *see also id.* at 8.)

### a.  Knowledge of a Substantial Risk of Harm

The starting point of Plaintiff's argument is that as a transgender prisoner she is subject to

a heightened risk of sexual assault, and that Defendants were aware of this fact, both because of

its obviousness, and, for certain Defendants, because they were expressly notified of that

heightened risk.

Plaintiff's burden at this stage is to plead facts that "nudge[] [her] claims across the line

from conceivable to plausible," *Twombly*, 550 U.S. at 570.  As detailed above, Plaintiff's

Amended Complaint contains a number of studies and reports that detail the prevalence of sexual

assaults committed against transgender inmates in men's prisons.  While it is true that Plaintiff

does not directly allege that Defendants read the studies or reports, she argues that the "studies

clearly evince the obviousness of the risk to transgender women in men's prisons."  (Pl.'s Opp'n

10.)  Defendants hold various positions throughout the prison hierarchy, but common to all those

positions is a responsibility to ensure the safety of the inmates at Sullivan.  (*See* Am. Compl. ¶¶ 7–11.)  The Court believes that Plaintiff's allegations demonstrating the widespread recognition, "both inside and outside the correctional community," (*id.* ¶ 54), that transgender inmates face heightened risks of sexual assault, including in DOCCS facilities, render it plausible that Defendants, concerned about the safety of Sullivan's inmates, were aware that the Plaintiff "belongs to an identifiable group of prisoners who are frequently singled out for violent attack by other inmates," *Farmer*, 511 U.S. at 843, and thus was subject to a heightened risk of harm as a transgender prisoner in a male prison, *see Powell v. Schriver*, 175 F.3d 107, 115 (2d Cir. 1999) ("In our view, it was as obvious in 1991 as it is now that under certain circumstances the disclosure of an inmate's. . . transsexualism could place that inmate in harm's way."); *Lojan v. Crumbsie*, No. 12-CV-320, 2013 WL 411356, at *4 (S.D.N.Y. Feb. 1, 2013) ("[T]he argument that more than mere knowledge of [the] [p]laintiff's transgender status was required to put [the] [d]efendant on notice of [the] [p]laintiff's vulnerability is spurious."); *cf. Shultz v. Dart*, No. 13-CV-3641, 2016 WL 212930, at *2, *7 (N.D. Ill. Jan. 19, 2016) (finding on summary judgment that, based on the plaintiff's testimony relaying "only his own awareness that inmates scheduled for release face [a] particular [risk of assault], it [was] a reasonable inference that this was common knowledge among inmates and custodial staff," and thus "a reasonable jury [could] find that the risk was so obvious that [the defendant] must have been aware of it"); *Godfrey v. Russell*, No. 14-CV-476, 2015 WL 5657037, at *17 (W.D. Va. Sept. 24, 2015) ("Prison officials' subjective knowledge may also be proven by evidence of an inmate's inherent vulnerability, even if he did not notify authorities that he feared for his safety in general or at the hands of a particular inmate or group."); *Stover v. Corr. Corp. of Am.*, No. 12-CV-393, 2015 WL 874288, at *10 (D. Idaho Feb. 27, 2015) (finding at summary judgment stage that based on evidence that the

17

defendants were aware that the plaintiff was a transgender prisoner and was housed in an open

dorm with up to 58 other male sex offenders, "a jury could reasonably conclude that [the

defendants] subjectively drew the inference that [the] [p]laintiff faced a substantial risk of harm

at the hands of the other sex offenders"); *Silvian v. Dart*, 897 F. Supp. 2d 694, 704 (N.D. Ill.

2012) (finding that the plaintiff adequately pleaded the subjective prong of a failure to protect

claim where he alleged that he was "the only person of Hispanic origin housed in the maximum

security [block], while the significant majority of the other inmates were African-American,"

which "put[] him in an identifiable group of prisoners who are singled out for attack" (internal

quotation marks omitted)).[8]

    Additional allegations against Griffin and Giglio provide more support for Plaintiff's

contention that those two Defendants were aware of risks Plaintiff faced as a transgender inmate.

*See Corbett v. Kelly*, No. 97-CV-682, 2000 WL 1335749, at *4 (W.D.N.Y. Sept. 13, 2000) ("An

inmate's advance notification to prison officials of a risk of harm . . . may be a factor to show

that the officials had knowledge of the risk."). Most relevant are the letters that were alleged to

---

[8] Contrary to Defendants' argument, such a finding, at this stage, does not amount to "impos[ing] a strict liability standard in personal injury cases involving transgender inmates." (Defs.' Reply Mem. of Law in Further Supp. of Their Mot. To Dismiss the Am. Compl. ("Reply Mem.") 1–2 (Dkt. No. 23).) First, this case is currently at the motion-to-dismiss stage, where Plaintiff need only allege facts that make her claims "plausible." As the Supreme Court in *Farmer* made clear, "obviousness of a risk is not conclusive and a prison official may show that the obvious escaped him." *Farmer*, 511 U.S. at 843 n.8. Thus, if there is eventually a motion for summary judgment or a trial in this case, Defendants can put forward evidence that, despite the widespread recognition that transgender inmates faced a heightened risk of sexual assault, Defendants were not aware of that fact. Second, a plaintiff does not make out a deliberate indifference claim merely by establishing subjective awareness of a substantial risk of harm. A plaintiff must demonstrate both the awareness of risk *and* that the defendant "disregards that risk by failing to take reasonable measures to abate the harm." *Hayes*, 84 F.3d at 620; *see also Farmer*, 511 U.S. at 844 ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.").

have been sent by the Sylvia Rivera Law Project to Auburn Correctional Facility's

Superintendent Burge in 2008 and 2009 informing him "of the disproportionate risk of sexual

violence that [Plaintiff] faced as a transgender female prisoner in a men's facility."  (Am. Compl.

¶ 19.)  Plaintiff alleges that (1) letters sent on behalf of prisoners, such as those sent by the Sylvia

Rivera Law Project, "are maintained by DOCCS in the prisoner's file that is transferred along

with the prisoner each time she is moved to a different DOCCS prison," (*id.* ¶ 21), (2) her file

thus contained the letters from the Sylvia Rivera Law Project when she was transferred to

Sullivan, (*id.* ¶ 23), and (3) Griffin and Giglio were aware of the letters, (*id.* ¶¶ 60–61).

As Defendants point out, the allegations connecting the letters to Griffin and Giglio are

made upon "information and belief."  (*Id.* ¶¶ 21, 23, 60–61.)  Defendants take issue with this

pleading, but the Court finds it appropriate here because a plaintiff can plead based "upon

information and belief where the facts are peculiarly within the possession and control of the

defendant."  *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (internal quotation

marks omitted).  DOCCS's policies for maintenance of prisoner files and protocols for review of

such files upon transfer consists of information apparently within the possession and control of

Defendants, which Plaintiff would not have access to without discovery.  Additionally, the belief

that Griffin and Giglio would have read the letters contained in the file "is based on factual

information that makes [such an] inference . . . plausible."  *Id.*  Specifically, Plaintiff alleges that

Griffin was "directly responsible for . . . authorizing and managing the policies, procedures[,]

and customs governing day-to-day security," and Giglio was the deputy superintendent for

security, responsible for "supervision of staff and prisoners to ensure a safe environment."  (Am.

Compl. ¶¶ 7–8.)  The inference that the two would review a newly transferred prisoner's file is

not one "marked by extraordinary (and unjustified) leaps of logic."  *McNaughton v. de Blasio*,

No. 14-CV-221, 2015 WL 468890, at *7 (S.D.N.Y. Feb. 4, 2015).  Accordingly, the Court finds

it reasonable to infer that Griffin and Giglio read the letters, which provide additional support for

Plaintiff's claim that both were aware of a heightened risk of sexual assault faced by Plaintiff as

a transgender inmate.[9]

b.  Conscious Disregard of the Known Risk

While the Court finds that Plaintiff has adequately alleged at this stage that each

Defendant was aware of a general heightened risk of sexual assault faced by Plaintiff as a

transgender woman in a male prison, this does not end the inquiry in this case.  "*Farmer* requires

more than knowledge of a substantial risk; there must be a conscious disregard thereof."

*Morales v. Seltzer*, No. 02-CV-6059, 2004 WL 1594863, at *6 (S.D.N.Y. July 16, 2004); *see*

*also Baines v. City of N.Y.*, No. 01-CV-2645, 2004 WL 213792, at *6 (S.D.N.Y. Feb. 5, 2004)

(report and recommendation) ("To succeed on [a failure-to-protect] claim, the prisoner must

---

[9] Plaintiff also points to letters sent directly to Griffin, which Griffin then provided to Urbanski, outlining two occurrences of what Plaintiff characterizes as "harassment" by Sullivan correctional officers, which also conveyed Plaintiff's fear that "gender-identiy [sic] based harassment by DOCCS employees would 'worsen and esacalate [sic] to the point of violence.'" (*See* Am. Compl. ¶¶ 62–67.)  As is clear from the Amended Complaint, and as Defendants point out, (*see* Defs.' Mem. 20; Reply Mem. 7), the letters detail only actions by, and fears of, prison staff and not inmates.  The same is true of a letter allegedly sent by the Sylvia Rivera Law Project to Superintendent Harold Graham at Auburn Correctional Facility.  (Am. Compl. ¶ 20.) While it is true that a defendant can be aware of a substantial risk of harm to a plaintiff even if the defendant is not aware of the specific assailant that ultimately harms the plaintiff, *see, e.g.*, *Warren*, 579 F. Supp. 2d at 495, there is a critical difference in the types of remedial measures one would expect to be taken in response to the risk of harm from correctional officers as opposed to inmates.  Indeed, Plaintiff's chief criticism of Defendants' actions is that they allowed for *too few* correctional officers to supervise Sublevel E.

establish both that a substantial risk to his safety actually existed and that the offending prison officials knew of *and consciously disregarded that risk*." (emphasis added)).

While Plaintiff has adequately alleged knowledge of a general heightened risk of sexual assault of transgender inmates, Plaintiff's claim is predicated on more than that. Plaintiff does not challenge the decision to place her in a male prison, or the decision to place her in general population versus protective custody.[10] Rather, Plaintiff alleges that her vulnerability as a transgender inmate made her *placement in the allegedly unsupervised Sublevel E* a substantial risk to her safety. Indeed, the gravamen of the Amended Complaint is that the Defendants failed to ensure adequate supervision of Sublevel E—the area where Plaintiff, a vulnerable inmate, worked. (*See, e.g.*, Am. Compl. ¶ 1 ("Defendants knew that the unmonitored area where [Plaintiff's] program assignment took place was dangerous and that she, as a transgender prisoner, was at very high risk of sexual violence, yet they consciously disregarded the known risk to her safety."); *id.* ¶ 3 (alleging that Defendants "failed to take reasonable measures to prevent harm to [Plaintiff], including allowing isolated sublevels of the prison to remain unmonitored for most of the day and particularly at times when they knew [Plaintiff] worked in that area"); *id.* ¶ 47 ("Defendants acted with deliberate indifference to the safety of [Plaintiff] by allowing a sexual predator not only to reside in the same block as a transgender female but also to occupy an unmonitored area near where she was assigned to work."); *id.* ¶ 55 ("Despite actual knowledge that sexual violence was likely to occur, Defendants acted with deliberate

---

[10] It bears repeating that Plaintiff does not allege she suffered any attacks from other inmates in the nearly two decades she was in prison prior to the attack at Sullivan.

indifference to [Plaintiff's] safety by allowing her to work in an area with inadequate supervision and classrooms that . . . were freely accessible to other prisoners.").)

The allegations addressed to specific Defendants similarly focus on their actions (or lack of action) relating to security in Sublevel E.  (*See, e.g.*, *id.* ¶ 60 (addressing Griffin's actions, and noting that, "[d]espite the fact that [Plaintiff's] file was replete with information regarding the significant risk of harm she faced because of her gender identity, *the security at Sullivan remained inadequate*" (emphasis added)); *id.* ("Griffin knew about the routine lack of adequate supervision in the sublevel area where [Plaintiff] was raped and was aware of Williams' history of sexual assaults.  Yet in spite of this information and his responsibilities, *security remained inadequate* and [Plaintiff] was placed in harm's way."); *id.* ¶ 61 (alleging that Giglio "knew about the routine lack of adequate supervision in the sublevel area where [Plaintiff] was raped and was aware of Williams' history of sexual assaults.  Yet in spite of this information . . . *security remained inadequate* and [Plaintiff] was placed in harm's way" (emphasis added)).)

At the outset, the Court notes that a missing allegation material to any finding that such facts allege deliberate indifference is an allegation that any of the Defendants (with the exception of Cohen), *knew that Plaintiff's work assignment* required her to work in Sublevel E.  It is true that Plaintiff's opposition papers claim that some Defendants knew she was assigned to a job requiring her to work in Sublevel E (*see* Pl.'s Opp'n 20 (stating that Giglio "was aware that [Plaintiff] was at risk of sexual assault because she was a transgender woman assigned to work in a dangerous, unsupervised area occupied by a known sexual predator"); *id.* at 23 ("Given that Defendant Barlow knew that [Plaintiff] was a transgender woman vulnerable to sexual assault assigned to a dangerous area with inadequate monitoring, he was deliberately indifferent to a

known risk of serious harm.").)  But the Amended Complaint is devoid of any allegations along those lines; specifically, there are no allegations as to who decided that Plaintiff would be an Inmate Program Associate or the extent to which Defendants (again, other than Cohen) were either aware that she was an Inmate Program Associate or that being an Inmate Program Associate required her to work in the allegedly unsupervised Sublevel E.[11]  Accordingly, any of the alleged unreasonable actions taken by Defendants—for example, Griffin's decision not to improve security in Sublevel E, Giglio's decision to assign only one officer to Sublevel E, and Ladenhauf's decision to not properly patrol the area—could not have been a "conscious disregard" of any risk to Plaintiff if Defendants did not know that the decisions would impact her at all.[12]

The Court further finds that Plaintiff has not sufficiently pleaded that the conditions in Sublevel E, of which all Defendants were allegedly aware, posed a substantial risk to inmates in the sublevel.  *See, e.g.*, *JCG v. Ercole*, No. 11-CV-6844, 2014 WL 1630815, at *26 (S.D.N.Y. Apr. 24, 2014) (rejecting a deliberate indifference claim where the plaintiff did not "plead facts sufficient to suggest that prison conditions posed a generalized threat to the safety of all inmates"

___

[11] The Amended Complaint does make an allusion to the fact that Defendants knew that Plaintiff worked in Sublevel E.  Specifically, Plaintiff alleges that Defendants "failed to take reasonable measures to prevent harm to [Plaintiff], including allowing isolated sublevels of the prison to remain unmonitored for most of the day and particularly *at times when they knew [Plaintiff] worked in that area*."  (Am. Compl. ¶ 3 (emphasis added).)  But this vague and conclusory statement appears in the Amended Complaint's preliminary statement, groups together all Defendants, and lacks any support in the remainder of the Amended Complaint. Perhaps Plaintiff can crystallize this point in a Second Amended Complaint.

[12] The Court finds that such an allegation would be particularly helpful here given that Plaintiff alleges that Sublevel E "contained classrooms and an administrative office," and that the classrooms were used for "programming and instruction for prisoners with disabilities," as well as for "Sex Offender program meetings," which are narrow purposes, and ones that would not appear to cause Plaintiff to be in Sublevel E.

(internal quotation marks omitted)), *adopted by* 2014 WL 2769120 (S.D.N.Y. Jun. 18, 2014);

*Coronado v. Goord*, No. 99-CV-1674, 2000 WL 1372834, at *5 (S.D.N.Y. Sept. 25, 2000) ("[I]t

is sufficient under *Farmer* that prison conditions posed a generalized threat to the safety of all

inmates."). In general, however, "[a] failure to protect claim requires more than a showing that

the correctional facility contains dangerous conditions. Rather, the plaintiff must demonstrate

that [the defendant was] deliberately indifferent to the risks those dangers posed to the plaintiff."

*Edney v. Kerrigan*, No. 00-CV-2240, 2004 WL 2101907, at *6 (S.D.N.Y. Sept. 21, 2004) (report

and recommendation). To state a claim, therefore, "a plaintiff must allege that the defendants

knew of a history of prior inmate-on-inmate attacks similar to the one suffered by the plaintiff

and that the measures they should have taken in response to such prior attacks would have

prevented the attack on the plaintiff." *Parris v. N.Y. State Dep't of Corr. Servs.*, 947 F. Supp. 2d

354, 363 (S.D.N.Y. 2013); *see also JCG*, 2014 WL 1630815, at *25–26 (rejecting deliberate

indifference claim for injuries sustained from physical attacks that occurred while the plaintiff

was being taken to the SHU because the plaintiff did not "plead facts sufficient to suggest

that . . . there were other attacks against prisoners being transferred to the SHU").

    The Amended Complaint contains no allegations about any pattern of violence in

Sublevel E. There are no allegations that *any* inmates had ever been involved in *any* attacks on

Sublevel E, let alone that such attacks were common and thus would provide notice to

Defendants that the conditions in Sublevel E posed a substantial risk to inmates. There are also

no allegations that there had been any sexual assaults on Sublevel E before Plaintiff was sexually

assaulted. *See Coronado*, 2000 WL 1372834, at *6 (granting motion to dismiss deliberate

indifference claim founded upon knowledge of risk to inmates in the correctional facility's yard

where the plaintiff did not allege "the nature of the other attacks" in the yard "or provide[] any

24

estimate as to the number of such incidents during the period he was incarcerated"); *see also Rennals v. Alfredo*, No. 12-CV-5300, 2015 WL 5730332, at *6 (S.D.N.Y. Sept. 30, 2015) (dismissing deliberate indifference claim where the plaintiff alleged being attacked in prison by an inmate with a cast, because the "[p]laintiff d[id] not allege that there were any previous attacks by inmates with casts in the prison").   And with respect to Plaintiff specifically, there are no allegations that there had been any sexual assaults of transgender inmates (let alone a pattern of such), either on Sublevel E or at Sullivan more generally.   While Plaintiff alleges that she told Cohen that prisoners could "enter and exit" Sublevel E because the entrance "was usually unlocked," and that there was not enough "control over the area," her complaint to Cohen— which is not alleged to have been shared with other Defendants—focused only on the resulting noisiness of the area, not on any danger of violent attacks as a result of the lack of supervision. (Am. Compl. ¶ 26.)[13]   Accordingly, as currently pleaded, any actions taken by Defendants with

---

[13] Additionally, with respect to Cohen specifically, the Amended Complaint does not clearly allege what it is Cohen could have or should have done, as a civilian instructor, with respect to the allegedly dangerous conditions of Sublevel E.

respect to the supervision of Sublevel E could not have been in conscious disregard of a substantial risk to Plaintiff.

Based on the foregoing, Plaintiff has failed to adequately allege that any Defendants consciously disregarded a substantial risk of harm to Plaintiff.[14]

### C.  Supervisory Liability

Defendants also contend that Plaintiff has not alleged that any Defendants can be held liable under a theory of supervisory liability because Plaintiff has not alleged sufficient personal involvement of any Defendants.  (Defs.' Mem. 20–25.)

#### 1.  Applicable Law

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation."  *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013); *see also Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir. 2004) ("[I]n this Circuit[,] personal involvement of [the] defendants in alleged constitutional

---

[14] The Court has not ignored Plaintiff's allegations addressing Williams' dangerousness. Even if Defendants were aware that Williams had previously committed sexual assaults, Plaintiff's argument that "allowing Williams to be placed in an isolated program area with [Plaintiff] placed her at a serious risk of harm," (Pl.'s Opp'n 14; *see also id.* at 18 ("[Griffin] was aware of Williams' history of sexual predation, and yet he allowed Williams to be placed in the same . . . program area as [Plaintiff].")), still suffers from the same flaw discussed above, namely, that no Defendant, aside from Cohen, is alleged to have known of Plaintiff's work assignment.  To the extent Plaintiff argues that any Defendants violated Plaintiff's rights by housing Williams and Plaintiff in the same prison block, (*see, e.g.*, *id.* at 18), this claim would fail because the sexual assault occurred not in her cell block, D North, but rather, at her place of work, Sublevel E.  The Amended Complaint does not allege who had access to Sublevel E (e.g., only prisoners housed in the D North block as opposed to all prisoners), and so Plaintiff has not alleged whether housing Williams in a different block would have even prevented him from sexually assaulting Plaintiff.  Indeed, the Amended Complaint emphasizes the unrestrictive nature of the access to Sublevel E.  (*See* Am. Compl. ¶ 26 ("Prisoners could walk in and out of Sublevel E at will.").)

deprivations is a prerequisite to an award of damages under § 1983." (internal quotation marks omitted)); *Cowan v. City of Mount Vernon*, 95 F. Supp. 3d 624, 644 (S.D.N.Y. 2015) ("Because vicarious liability is inapplicable to § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." (alteration and internal quotation marks omitted)).  The Second Circuit has held that the personal involvement of a supervisory defendant may be shown by evidence that

> (1) the defendant participated in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *see also Grullon*, 720 F.3d at 139 (same).

In *Iqbal*, however, the Supreme Court rejected the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution," *Iqbal*, 556 U.S. at 677, and thus courts in this Circuit have noted that *Iqbal* "may have eroded the *Colon* factors by limiting the ways in which personal involvement may be established," *Young v. Tryon*, No. 12-CV-6251, 2015 WL 309431, at *13 n.10 (W.D.N.Y. Jan. 23, 2015), *adopted by* 2015 WL 554807 (W.D.N.Y. Feb. 11, 2015); *see also D'Attore v. N.Y. City*, No. 10-CV-3102, 2011 WL 3629166, at *9 (S.D.N.Y. June 2, 2011) ("[T]he scope of what qualifies as 'personal involvement' by a supervisor has recently come into question by virtue of the *Iqbal* decision . . . ."), *adopted by* 2011 WL 3629018 (S.D.N.Y. Aug. 17, 2011).  Indeed, "[t]he Second Circuit has acknowledged, but not expressly held, that all five *Colon* factors may no longer be applicable post-*Iqbal*."  *Spring v. Allegany-Limestone Cent. Sch. Dist.*, — F. Supp. 3d —, 2015 WL 5793600, at *4 (W.D.N.Y. Sept. 30, 2015).  Most recently, the Second

Circuit—relying on the Supreme Court's emphasis in *Iqbal* that the factors necessary to establish a *Bivens* claim "will vary with the constitutional provision at issue," *Iqbal*, 556 U.S. at 676—has explained that "[t]he proper inquiry is not the name we bestow on a particular theory or standard, but rather whether that standard—be it deliberate indifference, punitive intent, or discriminatory intent—reflects the elements of the underlying constitutional tort," *Turkmen v. Hasty*, 789 F.3d 218, 250 (2d Cir. 2015) (citing *Iqbal*, 556 U.S. at 676).  In other words, supervisory defendants can be "liable, only if, through their own actions, they satisfy each element of the underlying constitutional tort."  *Id.*; *see also Battle v. Recktenwald*, No. 14-CV-2738, 2016 WL 698145, at *7 (S.D.N.Y Feb. 19, 2016) (same).  The *Colon* factors remain relevant to the extent that "a particular type of conduct [that] constitutes 'personal involvement' under *Colon*" could serve as conduct that supports a theory of direct liability. *Turkmen*, 789 F.3d at 250.  Thus, by requiring that claims against supervisory defendants satisfy each element of the underlying constitutional tort, supervisory liability has been essentially transformed into a question of direct liability.  *See Turkmen v. Ashcroft*, 915 F. Supp. 2d 314, 335 (E.D.N.Y. 2013) (noting that "in no uncertain terms," *Iqbal* "eliminated supervisory liability in *Bivens* claims," but that supervisors could still be held "directly liable for a constitutional tort if his actions satisfy the elements of that tort"), *rev'd in part on other grounds sub nom. Turkmen v. Hasty*, 789 F.3d 218 (2d Cir. 2015).[15]

### 2.  Application

Because a finding of supervisory liability requires that the allegations against that supervisory defendant "satisfy each element of the underlying constitutional tort," *Turkmen*, 789 F.3d at 250, to hold any of the supervisory Defendants liable here, Plaintiff must plead that any

---

[15] The Second Circuit cited the District Court's discussion of *Iqbal* and supervisory liability with approval.  *See Turkmen*, 789 F.3d at 250.

action taken by them was done so in conscious disregard of a substantial risk to Plaintiff. However, the alleged actions (or inaction) taken by each supervisory Defendant, although colored with language from *Colon*, are, at bottom, the same allegations underlying Plaintiff's claims for direct liability, and so the supervisory liability claims fail for much the same reasons.[16]

### a.  Sublevel E Security

Focusing on the *Colon* factors, Plaintiff argues Griffin, Giglio, and Barlow either created a policy or custom related to supervision and security in Sublevel E under which unconstitutional practices occurred, or were grossly negligent in supervising subordinates responsible for providing security in Sublevel E.  (*See, e.g.*, Pl.'s Opp'n 19 (Griffin was in charge of authorizing and managing policies, procedures, and customs governing day-to-day security, but failed to "take any steps to remedy the dangerous situation" in Sublevel E); *id.* at 21 (Giglio "failed to ensure the sublevel area was properly staffed," or secured, and thus created a policy or custom under which unconstitutional practices occurred and was grossly negligent in supervising subordinates); *id.* at 23 (Barlow was "grossly negligent in supervising subordinates who caused the violation because of his supervisory failure to ensure the area was properly staffed").)  But, as discussed above, Plaintiff has not adequately alleged that Griffin, Giglio, or Barlow made any decisions with respect to the security of Sublevel E in conscious disregard of a substantial risk of harm to either Plaintiff specifically or Sullivan inmates in general, and so they cannot be liable for deliberate indifference, either directly or as supervisors.  *See Turkmen*, 789 F.3d at 250

---

[16] The Court considers only Griffin, Giglio, and Barlow with respect to the question of supervisory liability because Urbanski, Ladenhauf, and Cohen are not alleged to have actually supervised any subordinates who committed constitutional violations.

(explaining that a supervisory defendant is liable "only if, through their own actions, they satisfy each element of the underlying constitutional tort").

### b.  Response to Sexual Harassment Letters

Plaintiff also contends that Griffin "had the requisite personal involvement because he was grossly negligent in supervising subordinates who caused the violation," when he referred Plaintiff's complaints regarding sexual harassment by correctional officers to Urbanski.  (Pl.'s Opp'n 19–20.)  First, Plaintiff's Amended Complaint does not adequately allege that Urbanski committed any constitutional violation in his treatment of the complaints.  *See Blyden v. Mancusi*, 186 F.3d 252, 265 (2d Cir. 1999) ("Of course, for a supervisor to be liable under [§] 1983, there must have been an underlying constitutional deprivation.").  Second, as discussed above, the complaints were related to the risk of sexual harassment by correctional officers and not inmates.  Thus, Griffin's supervision of Urbanski's treatment of the letters could not have been done with a conscious disregard of a substantial risk that Plaintiff would be sexually assaulted by fellow inmates.

### III.  Conclusion

In light of the foregoing analysis, the Court grants Defendants' Motion To Dismiss the Amended Complaint.  However, because this is the first adjudication of Plaintiff's claims on the merits, the dismissal is without prejudice, and Plaintiff may file a Second Amended Complaint within 30 days of this Opinion and Order.  Any amended complaint should address the issues

identified by the Court. The Clerk of Court is respectfully requested to terminate the pending

Motion. (Dkt. No. 20.)

SO ORDERED.

DATED:        March 3 1 , 2016
              White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE