170621manningOA                    Argument

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   LESLIEANN MANNING,

4                  Plaintiff,

5            v.                          15 Cr. 00003(KMK)

6   PATRICK GRIFFIN, et al.,

7                  Defendants.

8   ------------------------------x        White Plains Courthouse
                                           White Plains, N.Y.
9                                          June 21, 2017
                                           11:45 a.m.
10
    Before:
11
                       THE HONORABLE KENNETH M. KARAS,
12
                                              District Judge
13
                             APPEARANCES
14
    CARDOZO CIVIL RIGHTS CLINIC
15       Attorneys for Plaintiff LeslieAnn Manning
    SUSAN HAZELDEAN
16  BETSY GINSBERG

17  NEW YORK STATE ATTORNEY GENERAL'S OFFICE
         Attorney for Defendants Patrick Griffin, et al.
18  MARIA HARTOFILIS

19

20

21

22

23

24

25
```

170621manningOA                 Argument

1              (In open court)

2              THE LAW CLERK:  LeslieAnn Manning v. Griffin, et al.

3              Counsel, state your appearances for the record.

4              MS. HAZELDEAN:  Good morning, your Honor.  My name is

5    Susan Hazeldean here on behalf of plaintiff LeslieAnn Manning.

6              THE COURT:  Good morning.

7              MS. GINSBERG:  Betsy Ginsberg here on behalf of

8    LeslieAnn Manning.  Good morning, your Honor.

9              MS. HARTOFILIS:  Good morning, your Honor.  Assistant

10   Attorney General Maria Hartofilis for the defendants.

11             THE COURT:  Good morning.  Please be seated.

12             They say the sequel is never as good.  I beg to

13   differ.  All right.

14             So, we're here for argument on the motion.  I've read

15   the papers.  It's the defendants' motion.  The floor is yours.

16             MS. HARTOFILIS:  Defendants' motion, your Honor.

17   Thank you.

18             The defendants move to dismiss the second amended

19   complaint, your Honor, because it's our position that the

20   plaintiff did not cure the pleading deficiencies the Court

21   enumerated in its decision.  They did not allege the requisite

22   facts that are required to establish the subjective prong of

23   deliberate indifference.  The new allegations that they raise

24   about a sexual activity in sublevel E and some sexual assaults

25   without alleging when they occurred, the nature of the

170621manningOA            Argument

1   assaults, whether the defendants were even working at the

2   facility, whether they were aware, most significantly, whether

3   they involve transgender inmates, which is the issue in this

4   case, there are no such allegations.  So, we feel that they did

5   not cure the pleading deficiencies alleged in the claim and the

6   personal involvement of the named defendants.

7           THE COURT:  So, one would imagine, never having run a

8   prison myself, but one would imagine that prison officials are

9   constantly monitoring where the weak spots might be in terms of

10  security and monitoring; the same way, you know, like a police

11  precinct commander will note certain streets within the

12  precinct where there might be an uptick in criminal activity.

13  So then you would figure out, okay, what can we do to address

14  that.

15          As you know, it may be that there's no precise number

16  or precise dates that are given of the sexual assaults that

17  take place in subblock E or even the other, sort of, sexual

18  activity, but I'm not sure why it matters that there's no

19  transgender attacks that are identified, because why wouldn't

20  it tell the prison officials that subblock E is a dangerous

21  area, and combined with the, sort of, extra danger that is

22  presented when there are transgender inmates in an all-male

23  facility as plaintiff is alleging here, wouldn't that put them

24  on notice that they need to change whatever procedures they

25  have in place, whether it's cameras, whether it's increased

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170621manningOA              Argument

1    security guard monitoring, whether it's making people sign in

2    before they go, whatever it is, I wouldn't pretend to know

3    the answers, but why wouldn't that at least call out for

4    something along those lines?

5          MS. HARTOFILIS:  Of course, your Honor.  Of course

6    they have to stay abreast of any issues in the prison, but it's

7    our position, that not only do they not allege with specificity

8    in the nonconclusory or nonvague allegations that there were

9    assaults of transgenders, but they don't allege that there

10   were, sufficiently, assaults of any inmates.

11          The allegations of sexual activity -- sexual activity,

12   I mean, we all know that there is sexual activity in prison,

13   consensual sexual activity between inmates.  That wouldn't put

14   them on notice that Ms. Manning was at risk of being raped, but

15   they do have to say a little bit more than there was sexual

16   activity and sexual assaults in the past.  When?  And they also

17   don't allege that they knew about it.  They have to know about

18   them.

19          Like your Honor just stated, if they're aware, then

20   they would have to take the measures, but if they're not aware,

21   how can they take the measures specifically for that area,

22   because that was the deficiency that the Court found, limited

23   to that area, but even taking the prison as a whole.

24          THE COURT:  I mean, it's not a 90-plea center.  They

25   don't have to identify all that much in terms of specifics for

170621manningOA            Argument

1    the history of the inappropriate behavior or even violent

2    behavior.  And there certainly is enough for them to say that,

3    for example, Cohen is told by plaintiff, look, there's people

4    coming and going, really, it's not a secure environment, and

5    Cohen basically says, What do you want me to do about it?

6    That's specific notice of an unmonitored, sort of, unsecured

7    area; the notion that there are sexual assaults and prison

8    officials wouldn't know about that is I think a little

9    difficult to accept.  Or, put another way, it's not even

10   plausible that they would know because that's all we're testing

11   here, is plausibility.  And you know, the dates of the

12   particular attacks, I'm not sure why that matters.  To the

13   extent that they happened, and they happened in subblock E,

14   and, as I said, plaintiff says to Cohen it's kind of a

15   free-for-all in subblock E, and Cohen, sort of, throws up his

16   hand and says, Well, what do you want me to do about it?

17        MS. HARTOFILIS:  The allegations originally were that

18   the area was noisy and the doors -- inmates would come and go;

19   it was a hangout area.  And another was that she complained to

20   Cohen that the area was dangerous.  What do you mean by

21   dangerous?  Is it an inmate could get attacked?

22        Rape is a serious risk.  She's been in the prison for

23   a very long time.  She could have filed a complaint, filed a

24   grievance.  He is a teacher for the sensorially disabled

25   inmates.  He's a civilian.  And to assume that he would have

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170621manningOA              Argument

1  the authority to issue disciplinary violations, you know, is a

2  real leap.

3        THE COURT:  Why couldn't Cohen then go to a sergeant,

4  to a captain, to the warden and say this is what the inmates

5  are telling me.  You're right.  Cohen can't be the person who

6  adopts or mandates a difference in the security protocols, but

7  Cohen can at least be a conduit in information.

8        MS. HARTOFILIS:  He could have.  Maybe he didn't.  We

9  don't know.  Maybe he did do that.  But you can't have a

10 civilian -- she did have recourses.  If she was concerned, she

11 could have a complaint to people who could have done something

12 about it, and she didn't do it.  She's alleging that the

13 alleged attacker had exposed himself to her previously.  She

14 could have reported that and she didn't.  She had reported to

15 her attorneys about the sexual pat frisks and her attorneys

16 contacted the prison.  She could have done the same thing.  If

17 she didn't want to do it through the facility, she could have

18 contacted attorneys like she has been doing, and they would

19 have immediately reached out to the facility, but none of that

20 was done here, your Honor.

21       THE COURT:  I think the reason she doesn't go to the

22 prison officials after Williams exposed himself is because

23 she's worried about reprisal from doing that, especially in an

24 environment where she also alleges that she was dealing with

25 harassment from the guards themselves.  Even from her

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170621manningOA              Argument

1    perspective, it's not as if there's a friend who can be trusted

2    to deal with this.

3              And before I forget, my recollection is that the other

4    thing that plaintiff alleges with regard to -- so she alleges

5    that there were sexual assaults, plural.  And then in response

6    to some of these attacks, that there were changes in the, sort

7    of, security pattern, like, they were temporary.  They would

8    maybe change how it was that they would try to monitor the

9    area, but they never really adopted any, sort of, permanent

10   change.  That evidence is knowledge on their part that there

11   has been a problem and there's a need to address it, except

12   that they didn't stick with it.

13             MS. HARTOFILIS:  Your Honor, which defendants?  Would

14   Peter Cohen be personally liable for something like that or the

15   officer, the sergeant who was just named in the caption, no

16   allegations?  What could the sergeant have done?

17             And again, when were those sexual assaults?  It is

18   important when they occurred.  Was it a few months ago?  Was it

19   five years ago?  Ten years ago?  That is very, very relevant in

20   this case because for them to make changes, they had to have

21   had the knowledge about that specific area, and they don't

22   allege that they did.

23             THE COURT:  Okay.  Other points you want to address?

24             MS. HARTOFILIS:  The personal involvement, your Honor,

25   which I just touched on very briefly, that they do not allege

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170621manningOA               Argument

1   each individual's personal involvement in this case, from the

2   superintendent down to Peter Cohen.

3          And the last thing that I'd like to add is that

4   they've had three opportunities now.  There was a complaint, an

5   amended complaint, and a second amended complaint.  The federal

6   rules don't provide for a third amended.  The Court, it's our

7   position, should deny them the opportunity to amend it again,

8   because if they had these allegations, they would have been in

9   the second amended complaint because the Court's order was very

10  explicit as to what the pleading deficiencies were.

11         THE COURT:  Enough is enough from your perspective, to

12  put it bluntly.

13         MS. HARTOFILIS:  To put it bluntly, to put it bluntly.

14  Thank you.

15         THE COURT:  All right.  Thank you.

16         MS. HAZELDEAN:  Good morning, your Honor.

17         THE COURT:  Good morning.

18         MS. HAZELDEAN:  Your Honor, both sides in this case

19  acknowledge that in this Court's prior order on March 31st of

20  2016 dismissing the plaintiff's amended complaint, this Court

21  ruled that there were sufficient facts in the complaint to find

22  that all defendants knew that LeslieAnn Manning was at risk

23  of sexual assault because she was a transgender woman in a

24  man's prison.

25         As you know, your Honor, there are two elements of

1    deliberate indifference.  The first is knowledge of the risk,

2    and the second is whether, knowing that Ms. Manning was at risk

3    of sexual assault – as this Court has found all the defendants

4    did know or were alleged to know in the complaint – knowing

5    that she was at risk of sexual assault, whether the defendants

6    took reasonable steps to abate the known risk of harm of sexual

7    assault that she faced.  And the second amended complaint

8    contains numerous facts, some of them new facts, showing the

9    defendants simply did not take reasonable steps to abate this

10   known risk of harm by sexual assault.

11           The complaint alleges that at no point prior to the

12   rape did the defendants or any other DOCCS official speak with

13   LeslieAnn Manning to assess her safety as a transgender woman

14   at the Sullivan facility.  Issues of her safety as a

15   transgender woman were also not addressed during quarterly

16   reviews; whereas, at her current facility, as the complaint

17   alleges, safety issues for her as a transgender woman are

18   addressed during quarterly reviews.  Essentially, the

19   defendants took no steps to assess Ms. Manning's safety and

20   ensure that where she was housed, where she was programmed were

21   going to be safe and were going to be reasonable measures to

22   abate this known risk of sexual assault that she faced.

23           Instead, your Honor, the defendant simply treated her

24   like an average Joe, like any other prisoner, and they put her

25   in a position where there wasn't adequate supervision and

170621manningOA               Argument

1   adequate monitoring of who was entering in and out of the

2   facility to make sure that Ms. Manning was not going to

3   be sexually assaulted, which they knew was a risk of happening

4   because she was a woman, a transgender woman in a man's

5   facility who was at risk of sexual assault and all the

6   defendants knew that.

7          So, given that the complaint alleges that no

8   reasonable steps were taken to abate this known risk of sexual

9   assault, there are allegations that are plausible to show all

10  of these defendants were deliberately indifferent.

11         And as you point out, your Honor, *Farmer v. Brennan*

12  does not require that LeslieAnn Manning notified the warden or

13  the highest-level prison official of her concerns regarding

14  safety.  The knowledge of the risk of harm, the knowledge that

15  Ms. Manning was likely to be sexually assaulted doesn't have to

16  come from Ms. Manning herself; it can come from other sources.

17  And in this case, this Court has already found that all the

18  defendants knew that she was at risk of sexual assault.  And

19  knowing that Ms. Manning was at risk of sexual assault, placing

20  her in an unsupervised area, which was unmonitored, where a

21  known sexual predator could freely access her was not an

22  appropriate step to abate the risk.

23          The second amended complaint also alleges that

24  importantly there was no video surveillance in that sublevel

25  area.  Even though the presence of cameras decreases violence

170621manningOA                 Argument

 1  in correction facilities the sublevel area wasn't adequately

 2  patrolled.  Defendant Ladenhauf, who was responsible for

 3  patrolling, was to stop by in the morning at 9:00 to sign the

 4  logbook.  He sometimes didn't even ever come back, such that

 5  the only staff person in the sublevel was Defendant Cohen, an

 6  instructor.  So, there was inadequate supervision.  And because

 7  of that lack of supervision and the lack of control over who

 8  was entering and exiting the sublevel, a number of people were

 9  assaulted there.  There was also a pattern of sexual assaults

10  in the sublevel.

11          THE COURT:  Back up for a second, if we could.

12          The complaint is nonspecific about when these prior

13  assaults took place, and if they did take place five years

14  before -- hang on one second -- to the extent the assaults took

15  place five years before the assault at issue here, and then

16  there's five years where there's no assaults, so let's say

17  there's three assaults and five years beforehand and then no

18  more assaults, then would that really put them on notice?

19          MS. HAZELDEAN:  Your Honor, the defendants I think are

20  relying on cases like *Parris v. New York State Department of*

21  *Corrections* or *Coronado v. Goord*, and those are cases about an

22  average Joe inmate who is no more likely to be assaulted than

23  any other prisoner who essentially says, look, I was at risk of

24  assault because you put me in this area where everyone is going

25  to be assaulted.  That's not the case here.

170621manningOA            Argument

1          THE COURT:  You made that point in your rely brief,

2     and I understand that.  But I guess, the first step is the

3     extent to which the defendants would be on notice that subblock

4     E was a particular risk to Ms. Manning given that she herself

5     presented an added risk.  So, comparing her to the so-called

6     average Joe that you're referencing here, no matter where she

7     goes, your argument is she's more at risk.  And then,

8     particularly, when she's working in a part of the facility that

9     is unmonitored and where there were prior sexual assaults, that

10    that's where the second prong is satisfied here.  I understand

11    there are other pieces to your argument, but that's where

12    you're the focusing on.

13          And the point the defendants are making is that if the

14    prior sexual assaults because the complaint is not very

15    specific about when or how many, that it's really hard to say

16    that the second prong has been satisfied; for example, if they

17    were five or ten years before the incident that took place

18    here, then it's unclear that would put any of the named

19    defendants on notice that there was a problem in subblock E.

20          MS. HAZELDEAN:  Well, your Honor, as you said, all the

21    defendants were on notice that she was at risk of sexual

22    assault because she's a transgender woman and the question is

23    whether they took reasonable steps to abate that risk.  And so

24    given that they didn't assess her safety as a transgendered

25    woman, they didn't take that into account in deciding where to

170621manningOA              Argument

1   place her or where to put her in programming, that's what

2   satisfies the failure to take reasonable steps.

3        And it's our contention that it's not a reasonable

4   step to abate a known risk of sexual assault to put an inmate

5   in an unmonitored, unsupervised area where plaintiffs can come

6   and go and where, as you point out, our client did notify her

7   immediate supervisor that it was unsafe, it was dangerous, that

8   people are coming and going, and there was a history of

9   assaults.

10        And you're right, your Honor, we don't allege

11   specifically when those assaults took place, so that isn't

12   alleged in the complaint, but nevertheless, the complaint does

13   allege that the defendant simply failed to take any reasonable

14   steps.  It's not a reasonable step to put a person with a

15   target on their back for sexual assault in an unmonitored area

16   with no supervision with a known sexual predator, Ernest

17   Williams, who had previously sexually assaulted another inmate

18   at another facility and then was transferred to Sullivan

19   following that assault, and who had a reputation for engaging

20   in threatening and harassing behavior.  That is not a

21   reasonable step to ensure that somebody who you know is at risk

22   of sexual assault is going to be safe.

23        THE COURT:  What if there were cameras?  And what if

24   Williams figured out a blindspot in the camera, but the

25   defendant didn't know there was a blindspot and he carried out

170621manningOA              Argument

1   the attack anyway?  Would that put the defendants on the hook

2   here?

3         MS. HAZELDEAN:  Your Honor, I think the defendants

4   are -- the complaint alleges facts that show it plausible that

5   the defendants are liable here because they knew that she was

6   at risk of sexual assault and they failed to take appropriate

7   steps.  And I think the question is, is placing a person known

8   to be at risk of sexual assault in an unmonitored area, where

9   you know there is inadequate supervision, you know it isn't

10  being regularly patrolled, you know that there's no clear

11  sightline into the classroom so no one can see what happens in

12  there, and you know that there's a known rapist in that

13  classroom, is that a reasonable step to abate the known risk of

14  harm?

15        I think, your Honor, were the defendants unaware of,

16  sort of, a deficiency in the cameras, does that tip the scale

17  of, like, well, okay, it was reasonable, but the question is,

18  did they take reasonable steps?  And here, the complaint says

19  they didn't take any steps.  They never assessed her safety as

20  a transgender woman.  They never talked to her about it.  They

21  didn't address it when she arrived in Sullivan.  They didn't

22  address it in quarterly reviews.  When she was subject to

23  anti-transgender sexual harassment by corrections officers and

24  Defendant Urbanski was assigned to investigate it, at no point

25  in that investigation did he look at her risk of assault by

170621manningOA            Argument

1    other inmates who were going to be emboldened by the fact that

2    here is somebody for whom corrections officers have nothing but

3    hostility and contempt who aren't going to protect her.  So,

4    they just simply didn't take steps and they treated her like

5    every other inmate, and that's not a reasonable step when you

6    have somebody who is so clearly a target for sexual abuse.

7            In that situation, the defendants had a duty to take

8    reasonable steps to abate the harm, and the complaint does

9    allege some reasonable steps they could have taken.  They could

10   have placed her in protective custody.  They could have

11   assigned her to a program area where there was better levels of

12   supervision, or they could have placed her in sublevel E, but

13   as you say, they could have made sure there was adequate video

14   monitoring or they could have made sure that it was patrolled

15   regularly, but they didn't do any of those things.  They just

16   did absolutely nothing, and that's not a reasonable step to

17   abate the known risk of sexual assault.

18           THE COURT:  What did Sergeant Barlow do here that

19   crossed the line, or didn't do that crossed the line?

20           MS. HAZELDEAN:  Your Honor, Sergeant Barlow was

21   responsible for supervising officers and prisoners in his area.

22   This is what's alleged in paragraph 9 of the complaint.  He was

23   responsible for making sure that the corrections officers in

24   sublevel E followed the rules and regulations, that they

25   attended to their job duties.  And he himself conducted rounds

170621manningOA              Argument

1   of the area to make sure that it was safe and secure.  He also

2   read logbooks to ensure that they were administered correctly.

3   So, it's reasonable to infer, your Honor, that he knew it was

4   not being patrolled properly; that, in fact, Ladenhauf, who was

5   the officer assigned to patrol, didn't patrol.  He came once in

6   the morning for two minutes.  He looked around, he signed the

7   logbook and he left.  Sometimes he never even came back in the

8   afternoon.  Ladenhauf would have known that because he was

9   assigned to monitor those logbooks and to know whether it was

10  being patrolled properly.  He would have known that Ladenhauf

11  wasn't patrolling correctly.  He would have known that the area

12  had a history of assaults and was unsafe and unsupervised.

13          So, in a failure-to-protect case, a defendant is

14  personally involved if they are aware of the plaintiff's plight

15  and they could have taken steps to abate it, but they failed to

16  take any steps.  And here, given Barlow's responsibility as the

17  sergeant to supervise the officers and prisoners, to make sure

18  that Defendant Ladenhauf is doing his job, given that he knew

19  that the area was unmonitored, unsupervised, unpatrolled, there

20  was a history of assaults in that area, knowing that LeslieAnn

21  Manning as a person at risk of sexual assault was working

22  there, and then failing to take any steps to abate that risk of

23  harm, your Honor, he is personally involved in a constitutional

24  violation.

25          THE COURT:  And what about Urbanski?  Urbanski is

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170621manningOA                Argument

1    really the main charge.  Urbanski gets here to investigate the

2    correction officer on plaintiff's harassment, not

3    inmate-on-inmate issues.

4              MS. HAZELDEAN:  Right, your Honor, that's correct.

5              So Captain Urbanski was a captain in the facility.

6    He, again, was responsible for overseeing corrections officers

7    and the sergeants who were in charge of them.  He was also, as

8    you say, charged with investigating and responding to prisoner

9    complaints, including complaints regarding safety.  So, given

10   his responsibilities there, it's reasonable to infer that he

11   knew about the history of assaults in sublevel E.  He knew

12   about the pattern of sexual assaults in the sublevel areas.  He

13   knew that this was a dangerous place.  And he knew that

14   Ms. Manning was transgender and had been singled out for

15   harassment, as you say, by corrections officers who subjected

16   her to anti-transgender harassment, but, again, he didn't step

17   in.

18             And in terms of the harassment by corrections

19   officers, you're quite right, your Honor, that the allegations

20   here are that corrections officers in October and November of

21   2012 were sexually harassing Ms. Manning on account of her

22   transgender status and the reason why that matters, your Honor,

23   as it's now made clear, I think, in the second amended

24   complaint, which alleges that according to corrections experts,

25   if an officer permits anti-transgender harassment or is seen to

170621manningOA              Argument

1    exhibit hostility and contempt towards a transgender person,

2    this is going to embolden inmates.  It essentially communicates

3    to the inmates this is a disfavored prisoner, this is someone

4    who corrections officers don't want to protect; it essentially

5    declares open season on that transgender inmate.

6             THE COURT:  If the inmates know of the harassment,

7    right, or they know the harassment is tolerated?

8             MS. HAZELDEAN:  The allegation in the complaint, your

9    Honor, is that when corrections officers tolerate and permit

10   anti-transgender harassment to continue, this emboldens other

11   inmates to attack the transgender person.

12            THE COURT:  But only if they know about it, right?  In

13   other words, it only triggers the other inmates if they are

14   aware that it's tolerated.  If they don't know, if there's some

15   incident that takes place of a corrections officer harassing an

16   inmate and the other inmates don't know, then that wouldn't

17   embolden them, right?

18            MS. HAZELDEAN:  Right, your Honor.  I see what you're

19   saying.  I think that the allegations in the complaint here are

20   such that this would have been public knowledge.  This is not a

21   situation where, in secret, an officer was targeting

22   Ms. Manning.  This is where she was pulled out of a medication

23   line and physically assaulted.  I think, in view of other

24   prisoners, I'm sure that knowledge of this would have spread

25   around.  But your Honor, the point is, again, that Urbanski

170621manningOA            Argument

1   knew that if he were to tolerate anti-transgender harassment of

2   Ms. Manning as a transgender woman, that was going to embolden

3   the other inmates; and any investigation, according to the

4   complaint, any investigation that took place following the

5   complaints about this harassment did not address Ms. Manning's

6   risk of assault by inmates, it did not assess her safety as a

7   transgender woman.  So Urbanski, knowing that she was at risk

8   for all these reasons, because she was working in sublevel E

9   where there was inadequate supervision, because of the history

10  of assaults in sublevel E, because of the pattern of sexual

11  assaults, knowing all of this, he failed to take any steps and

12  as such, he is personally of involved.  That personal

13  involvement in a failure-to-protect case, as you know, your

14  Honor, simply means that the defendant was on notice of the

15  plaintiff's plight and failed to take any steps.  And we

16  certainly have allegations in the complaint that Urbanski was

17  in that situation.

18          THE COURT:  Any other points you want to address?

19          MS. HAZELDEAN:  No, your Honor.  That's it.

20          THE COURT:  Okay.

21          MS. HARTOFILIS:  May I, your Honor.

22          THE COURT:  Of course.

23          MS. HARTOFILIS:  I always say a few, but it could be

24  more than a few points.

25          THE COURT:  That's fine.  There's no red or yellow

170621manningOA            Argument

1   lights here.

2           MS. HARTOFILIS:  Great.  Thank you.

3           THE COURT:  Take your time.

4           MS. HARTOFILIS:  I just wanted to clarify something.

5           This statement that C.O. -- correction staff assaulted

6   Ms. Manning in front of inmates, that wasn't alleged in the

7   complaint.  They're alleging a pat frisk where they touched her

8   breasts, and they're just -- so that's not --

9           THE COURT:  The complaint is silent as to whether or

10  not other people saw it or not.

11          MS. HARTOFILIS:  Correct, correct.

12          And as far as Captain Urbanski, if her own attorneys

13  didn't raise the potential possibility in their letter of the

14  sexualized pat frisks could possibly lead to sexual assaults by

15  inmates, how is Captain Urbanski supposed to draw that

16  conclusion?  These unidentified correctional experts, who are

17  these people?

18          THE COURT:  Doesn't it stand to reason -- we don't

19  need experts to tell us that people model behavior.  If a

20  corrections officer were to strike an inmate having nothing to

21  do with how the inmate identifies, then one could imagine that

22  that would lead to an increase in violence because the inmates

23  would say, okay, it's open season on that person.

24          But what if the corrections officer strikes the person

25  because you're a snitch, boom, strikes the person, and then the

SABRINA A. D'EMIDIO - OFFICIAL COURT REPORTER
(914)390-4053

170621manningOA              Argument

1   other inmates say, okay, open season on the snitch.  I don't

2   know that we need an expert to tell us that link.

3          MS. HARTOFILIS:  That is correct, your Honor, but you

4   have a captain who gets a letter forwarded to him from a

5   superintendent that says the officers are conducting the pat

6   frisks in a way that makes her uncomfortable.  I don't remember

7   exactly what the allegations were.  And the truth is that all

8   inmates -- inmates don't like to be pat-frisked.  And I can

9   imagine a transgender inmate who is going through hormone

10  replacement therapy who might have breasts is not going to like

11  to be pat-frisked, but security has to conduct pat frisks a

12  certain way.  They have to pat them down, so that's one thing.

13         So, the captain gets this letter that says she's not

14  happy with the way the pat frisks are conducted.  How is

15  Captain Urbanski then supposed to say, you know what -- what is

16  he supposed to do personally?  He's required to investigate the

17  complaint that's given to him.  He did.  He investigated it.

18  The superintendent wrote to plaintiff's attorneys.  So, we

19  believe that that Captain Urbanski cannot be liable based on

20  that letter.

21         THE COURT:  The complaint alleges that he didn't

22  adequately deal with it.  I think paragraph 71 says that he

23  dealt with it inadequately.  And there may not be a lot of

24  specifics, but the allegation is contrary to the notion that

25  Urbanski handled that appropriately.

170621manningOA            Argument

1          MS. HARTOFILIS:  Okay, fine.  But the fact that he

2    that he investigated it, I don't know what else they were

3    looking for him to do in this investigation.  But the pat

4    frisks are not an issue here, and that's --

5          THE COURT:  I understand.  The issue is harassment.

6          MS. HARTOFILIS:  Yes, the issue is that could those

7    pat frisks lead -- but that's one issue.  The other thing that

8    they raise is, and we addressed it in our brief, is the

9    security measures that should have been taken.  But as we said

10   in our moving papers and our reply, if they are not aware of

11   the risk, what risks are they going to abate with these

12   cameras?

13         And there are no allegations that these five

14   defendants were involved in or would be the ones who would meet

15   with her when she came in or who would be involved in her

16   programming, so that's also very relevant on this issue.  Our

17   position is they didn't allege enough of a risk and that that

18   risk was known, so then there was no need for these additional

19   security measures.

20         The other point, Inmate Williams.  No allegation that

21   they knew that he was in that sublevel area, whether it was for

22   classes or programs.  No allegations that any of the defendants

23   were aware.  They allege that the five defendants were aware

24   that Ms. Manning worked there, but no allegations that they

25   knew that Williams was there.  No allegations that they knew

170621manningOA                Argument

1   Williams had committed sexual assaults in the past.  No

2   allegations that she told them that he had exposed himself to

3   her, so that's very relevant.

4          And last, but not least -- no, there's two more

5   points.  They said she shouldn't be treated like an average

6   Joe, that she shouldn't be treated like all the other inmates.

7   Then there should be allegations like we said when we first

8   started this argument that there were sexual assaults of

9   transgender inmates because it should be specific.  There

10  should be knowledge by these individuals of risk as alleged in

11  this complaint, and they don't allege that.

12         THE COURT:  Well, they do allege, though, that letters

13  were written on Ms. Manning's behalf to identify the safety

14  issues unique to her because of her transgender status, right?

15         MS. HARTOFILIS:  Right.

16         THE COURT:  And then Griffin is on notice.  And then,

17  of course, there's this national legislation, there's sort of a

18  national initiative or certainly information that identifies

19  that transgender inmates as a class are more at risk, right?

20  And we had this conversation the last argument.  What does that

21  mean for prison officials?  Does it mean, to make sure they're

22  never sued, they should just go ahead and put every transgender

23  inmate in solitary and then run the risk that they get sued for

24  doing that, right, that solitary itself becomes an Eighth

25  Amendment violation.

170621manningOA                Argument

1        But what the plaintiff is saying here is that there

2   needs to, at least, be some effort to try to figure out whether

3   she was at risk in terms of how she spent her day and that

4   there was never any, sort of, effort to reach out to

5   Ms. Manning and, sort of, say, Okay, what is your day like,

6   what are you doing, and then asking themselves, What should we

7   do to make sure that, because she's at a higher risk than the

8   average inmate, that we make sure that she's in an environment

9   where those risks are accommodated?

10        And they're saying that nothing was done here.  Not

11   that what was done wasn't enough – they're saying nothing was

12   done and that she's in the one cell block area where prior

13   incidents have happened, it's unmonitored, it's poorly

14   supervised, Cohen knows about it, and literally nothing is

15   done.  That's their argument.

16        MS. HARTOFILIS:  Right.  And the Court did find that

17   they satisfied the first prong for deliberate indifference,

18   that defendants were aware of this heightened risk that she

19   faced as a transgender woman, but that doesn't translate that

20   rape was inevitable or likely.  They had to have known that

21   that particular -- that was the Court's order in this case:

22   Was there a risk at that sublevel and were they aware of it?

23   And we don't believe that they have pled that.

24        THE COURT:  Anything else?

25        MS. HARTOFILIS:  That's it.

170621manningOA              Argument

1            THE COURT:  Thank you.

2            MS. HAZELDEAN:  May I briefly, your Honor.  Thank you.

3       Your Honor, again, as we discussed, this Court has

4  found that the defendants were on notice that Ms. Manning was

5  at risk of sexual assault because she's a transgender woman.

6  And in this new version of the complaint, the second amended

7  complaint, there are several new allegations with respect to

8  the defendants' failure to take reasonable steps to abate that

9  risk.

10       They failed to assess her need for safety as a

11  transgender woman when she arrived at Sullivan; no DOCCS

12  official or any defendant ever spoke with her about her safety

13  as a transgender woman; they didn't address it in quarterly

14  reviews.  They simply didn't take steps to make sure that this

15  known risk of sexual assault was going to be abated.

16       With respect to her placement in sublevel E, your

17  Honor, the allegation is plausible that the defendants knew

18  that there had been a history of assaults in that area, there

19  was a pattern of sexual assaults in the sublevel area.  And all

20  we're required to show at this point, your Honor, is that it's

21  plausible that the defendants knew of that and so they knew

22  that placing Ms. Manning in that area, which was unmonitored,

23  unsupervised, where there's no control over who is coming and

24  going was not an appropriate measure to abate the risk of harm

25  that she faced.

170621manningOA              Argument

1          The second amended complaint also alleges that there

2    were no cameras in sublevel E, even though video monitoring

3    would have decreased the risk of violence in that area.  So,

4    for all of these various reasons, your Honor, placing

5    Ms. Manning in sublevel E was not an appropriate measure to

6    abate the known risk of harm that she faced.  So, the

7    defendants are deliberately indifferent because they knew she

8    was at risk of sexual assault, but they failed to take any

9    reasonable steps to abate that risk of harm, your Honor.  Thank

10   you.

11         THE COURT:  Thank you.

12         Anything else?

13         MS. HARTOFILIS:  Nothing further, your Honor.  We rely

14   on our papers.

15         THE COURT:  Okay.

16         So, because this is round two, and because, frankly,

17   the issue has been very well briefed, and because dotting i's

18   and crossing t's will further delay the case, what I'm going to

19   do is give you my ruling now, and then we can go from there.

20         So, just in terms of some of the salient facts, we all

21   know the procedural history about what the ruling was back in

22   March of '16, and I did give plaintiff leave to file a second

23   amended complaint.

24         In terms of some of the salient allegations:  So,

25   plaintiff is a transgender female who has been incarcerated at

170621manningOA          Argument

1    various mens maximum security facilities for quite some time, I

2    think around two decades, and at the time was a prisoner at

3    Sullivan.

4         In addition to being a transgender female, plaintiff

5    also suffers from some pretty serious health problems,

6    including HIV, chronic obstructive pulmonary disease, heart

7    disease, hearing loss, and incontinence.  Plaintiff has

8    received hormone therapy for several years and has legally

9    changed her name to reflect her gender identity.

10        Now, plaintiff arrived at Sullivan on August 21 of

11   2012 and was housed in the general population.  She was later

12   assigned to work as an educational clerk assisting Defendant

13   Cohen, which required her to work in sublevel E, an area at

14   Sullivan that is described as, quote, "off a main corridor with

15   five rooms aligned down a hallway," and that's from paragraphs

16   27 and 28 of the second amended complaint.

17        Among her duties included assisting the deaf and

18   visually impaired with various tasks, as well as with assisting

19   in the distribution of supplies, such as paper and writing

20   instruments.

21        Now plaintiff has added some allegations regarding

22   sublevel E.  For example, plaintiff alleges that sublevel E was

23   known among the Sullivan inmates as a, quote, "big hangout"

24   because the prisoners could come and go as they pleased,

25   whether they were supposed to be there for programming or not.

1          Now, on February 5 of 2013, in the early afternoon,

2     approximately 1:15, while plaintiff was working her shift as an

3     inmate program associate in sublevel E, Cohen asked plaintiff

4     to deliver a paper to a prisoner sitting alone in a classroom.

5     This prisoner was Ernest Williams.  So, plaintiff complied with

6     the request and delivered the paper to Williams, but before she

7     could leave, Williams raped plaintiff and threatened to kill

8     her if she reported the incident.

9          Notwithstanding this threat, plaintiff reported the

10     incident, but she did wait two days and was taken to a medical

11     center where medical professionals examined plaintiff and found

12     that she exhibited signs of sexual assault.

13          After returning to Sullivan, plaintiff was transferred

14     to protective custody where she remained until March or April

15     of 2013, was released back into the general population, and

16     then subsequently transferred to the Clinton Correctional

17     Facility where she was housed in protective custody.  And she's

18     currently, at least at the time of the drafting of the second

19     amended complaint, incarcerated at Wende Correctional Facility.

20          Now, as a result of the sexual assault, plaintiff

21     alleges that she frequently, quote, "wakes up in the middle of

22     the night racked by nightmares and in sweats," and she does

23     this anywhere from four to seven nights per week.  She is

24     prescribed a bunch of medicine, including Zoloft for her

25     symptoms.

1          Now, the initial complaint was filed back in January

2     of 2015 against Griffin, Cohen, somebody identified as Mark

3     Royce, and then a couple of John Does.

4          Plaintiff filed an amended complaint on May 20, 2015

5     against Griffin, Giglio, Urbanski, Barlow, Ladenhauf, and

6     Cohen.  The second amended complaint does not include Giglio as

7     a defendant, FYI.

8          So, there was a motion to dismiss and the Court issued

9     an opinion on March 31, 2016, which granted the motion but

10    dismissed the first amended complaint without prejudice, so

11    here we are at round two.

12         In terms of the legal standards:  The Eighth Amendment

13    requires prison official to, quote, "take reasonable measures

14    to guarantee the safety of inmates in their custody."  That's

15    from the Second Circuit decision in *Hayes v. New York City

16    Department of Corrections*, 84 F.3d 614, 620.  And, of course,

17    all of this starts with the Supreme Court decision in *Farmer*,

18    which, obviously, will be the decision that governs here.

19         Now, prison officials have a duty to protect prisoners

20    from violence at the hands of other inmates because being

21    violently assaulted in prison is not part of the penalty that

22    criminal offenders are to pay for their offenses against

23    society.  That's what was said in *Lee v. Artuz*, 2000 WL 231083,

24    at *4, quoting from *Farmer*.  And as the *Farmer* Court noted,

25    quote, "Having incarcerated persons that demonstrate a

170621manningOA              Argument

1   proclivity for anti-social, criminal and often violent conduct,

2   having stripped them of virtually every means of

3   self-protection and foreclose their access to outside aid, the

4   government and its officials are not free to let the state of

5   nature take its course."  That's from page 833.

6        And what one Court in the District of Connecticut

7   noted is that, quote, "A prisoner is not reasonably safe if, as

8   a result of personal characteristics or past threats, that

9   prisoner is likely to be a victim of physical or sexual

10   assault."  The case is *Leconte v. Lightner*, 2015 WL 4104842, at

11   *2.

12        Now, to establish constitutional liability,

13   plaintiff/prisoner has to allege actions or omissions

14   sufficient to demonstrate deliberate indifference; in other

15   words, mere negligence will not suffice.  That's from the *Hayes*

16   decision at page 620.

17        To satisfy the deliberate indifference standard, the

18   plaintiff has to show, first, that she's incarcerated under

19   conditions posing a substantial risk of serious harm; and

20   second, the defendant/prison officials possessed sufficient,

21   culpable intent.  That's from *Hayes* at 620, citing *Farmer* at

22   834.

23        The first prong, as we all know, is objective and

24   requires that prison officials provide inmates with basic human

25   needs, one of which is reasonable safety said the Supreme Court

170621manningOA            Argument

1    in *Helling v. McKinney*, 509 U.S. 25, at page 30 and 33.

2            The second prong involves the culpable intent and,

3    there, there's an additional two-tier inquiry.  Quote, "A

4    prison official has sufficient culpable intent if the prison

5    official has knowledge that an inmate faces a substantial risk

6    of serious harm and disregards that risk by failing to take

7    reasonable measures to abate the harm."  So, the official must

8    be both aware of facts from which the inference could be drawn

9    that a substantial risk of serious harm exists and also, the

10   official must draw that inference, and that's all from *Farmer*

11   at page 837.

12           Now, with respect to, sort of, honing in on the

13   deficiencies that the Court found existed in the plaintiff's

14   amended complaint, there's no serious dispute here that

15   plaintiff has satisfied the objective prong of the deliberate

16   indifference test.  So, really, the heart of the defendants'

17   motion addresses the failure of the plaintiff to allege that

18   the defendants consciously disregarded the known risk to

19   plaintiff, in particular by allowing the plaintiff to work in

20   sublevel E.

21           Regarding the prior opinion, what the conclusion was,

22   was that while plaintiff had adequately alleged knowledge of a

23   general heightened risk of sexual assault of transgender

24   inmates, plaintiff's claim was predicated on the allegation

25   that her vulnerability as a transgender inmate made her

170621manningOA            Argument

1   placement in the allegedly unsupervised sublevel E a

2   substantial risk to her safety.

3          And what I noted in the prior opinion was that what

4   was missing was an allegation that was material to any finding

5   that would support that the defendants were -- in other words,

6   that the second prong was satisfied.  So, for example, there

7   were insufficient allegations, in the Court's view, that the

8   defendants knew that plaintiff's work assignment required her

9   to even work at sublevel E.  Certainly, that was true of Cohen,

10  but not as to the other defendants.  And in particular, what

11  was noted in the opinion was, quote, the amended complaint did

12  make an allusion to the fact that defendants knew that

13  plaintiff worked in sublevel E and that they allowed isolated

14  sublevels of the prison to remain unmonitored, particularly at

15  times when they knew plaintiff worked in that area.  But the

16  allegations, in my view, were vague and conclusory and only

17  appeared in the preliminary statement and grouped together all

18  the defendants and lacked any support in the remainder of the

19  amended complaint.

20         Also, in the Court's view, the amended complaint

21  didn't sufficiently plead that the conditions in sublevel E

22  posed a substantial risk to the inmates in the sublevel or that

23  the defendants were aware that there were particular risks to

24  inmates in sublevel E, let alone risks to plaintiff herself.

25         Now we have the second amended complaint.  And with

170621manningOA              Argument

1   regard to the defendants' knowledge that plaintiff's work

2   assignment required her to be in sublevel E, the Court's view

3   is the plaintiff has cured this previously-identified

4   deficiency.

5          Certainly, Cohen, which all along I thought plaintiff

6   had established Cohen was aware of plaintiff's work in sublevel

7   E.  After all, plaintiff worked for Cohen in that area.  But

8   also plaintiff has alleged that Ladenhauf was, quote,

9   "responsible for patrolling the area," closed quote; he would

10  sign a logbook indicating he had walked through the area, and

11  that, in fact, plaintiff had to ask Ladenhauf for a pass

12  whenever something required her to leave her job, which she had

13  done on numerous occasions.  So there's direct evidence that

14  Ladenhauf knew that plaintiff worked in sublevel E.

15         Regarding Griffin, Urbanski, and Barlow, the

16  allegation is that they stopped by sublevel E on several

17  occasions while plaintiff was working there and that all the

18  defendants knew who she was.  That's from paragraph 36.  Also

19  in paragraph 36, plaintiff alleges that each of these

20  defendants – Griffin, Urbanski and Barlow – was aware that

21  plaintiff was engaged in programming in the sublevel because

22  they had personally observed her at her work assignment, and,

23  in fact, Griffin had said hello to plaintiff when he saw her in

24  the sublevel.  So, in the Court's view, that issue has been

25  sufficiently addressed.

170621manningOA            Argument

1           Next is the issue of the awareness of conditions in

2    sublevel E, and there are additional allegations that plaintiff

3    makes, and defendants take the view that they're not

4    sufficient.

5           Now, some background here:  What the courts have held

6    is that, quote, "Although an inmate cannot rely on allegations

7    that prison officials knew of issues of prison safety in the

8    most general sense, it is sufficient to allege the defendants

9    knew the specific hazardous condition."  That's from *Stephens*

10   *v. Venettozzi*, 2016 WL 4272376, at *2.

11          Now, a plaintiff alleges, and I had this quote

12   earlier, but in paragraph 29, she alleges that sublevel E was

13   known among Sullivan inmates as a big hangout because the

14   prisoners could come and go as they pleaed, whether they were

15   supposed to be there for programming or not.

16          In addition to this, also in paragraph 29, plaintiff

17   alleges that, quote, "Because of the lack of control over who

18   entered the sublevel, as well as the lack of supervision in the

19   area, several people were assaulted there."  And also plaintiff

20   alleges that upon information and belief, there was a pattern

21   of sexual assault in the sublevel areas at Sullivan.

22          Now, with regard to the allegation that several people

23   were assaulted, actually with regard to both, there are no

24   details provided.  One could draw the inference that these were

25   assaults that took place while plaintiff was there or one could

170621manningOA              Argument

1    draw the inference that plaintiff had heard that there were

2    assaults there that predated her being there.  The complaint is

3    not specific.

4         One thing that defendants do take issue with is the

5    phrase "upon information and belief," but that's not something

6    that is fatal, even in a post-*Twombly* world.  This was noted in

7    *Lefkowtiz v. John Wiley & Sons, Inc.*, 2014 WL 2619815, at *9.

8         Now, in order to conclude that any particular

9    defendant had culpable knowledge of the risk presented in

10   sublevel E, the prior incidents would have to be longstanding,

11   pervasive and well documented, or expressly noted by prison

12   officials in the past, and the circumstances would have to

13   suggest that the defendant officials being sued had been

14   exposed to information concerning the risk and, thus, must have

15   known about it.  That's from *Farmer* at 842 and 843.

16        And the defendants argue that even these additional

17   allegations don't establish that they were aware of any prior

18   assaults, whether they were sexual assaults or otherwise.  But

19   one thing that the second amended complaint does allege is

20   that, as a result of some of these prior assaults in the

21   sublevel E area, that corrections officers changed their

22   supervision patterns, that they patrolled more frequently, and

23   they would lock the classrooms, but that all of these were

24   measures that were adopted temporarily, which makes two points

25   for plaintiff, obviously.  One is that they were aware, thus

170621manningOA           Argument

1   the change in the security protocols; but second,

2   notwithstanding the fact they were aware, they didn't adopt

3   any, sort of, longstanding change to address the security

4   issues, so they might temporarily alter the protocols.

5        So, whether or not it can be said that the prior

6   attacks were longstanding and pervasive, I think plaintiff has

7   plausibly alleged that the prior assaults were expressly noted,

8   that that's a plausible inference from how it is alleged that

9   the defendants or that the prison officials responded to these

10  attacks.  And it bears noting again that while the details are

11  not provided, plaintiff does allege a pattern of sexual

12  assaults, and that's not lost in terms of its significance

13  here.

14        Now, in terms of breaking it down defendant by

15  defendant, regarding Cohen, as I said, plaintiff alleges that

16  she told Cohen, quote, "that prisoners could enter and exit

17  sublevel E because the entrance was usually unlocked," and she

18  also shared with Cohen her view that there was just not enough

19  control over sublevel E.  She also alleges that on several

20  occasions, she expressed concern that the area was dangerous

21  because of the unfettered access and the general lack of

22  supervision.

23        She also alleges, in terms of Cohen's ability to

24  address some of this, that he had the ability and the authority

25  to lock or unlock doors in the sublevel.  He could issue

170621manningOA              Argument

1    disciplinary infractions to prisoners.  And, of course, he had

2    the authority and, in plaintiff's view, the responsibility to

3    notify security staff of any breach of security in the

4    facility.

5           Now, what defendants say is that the plaintiff didn't

6    really advise Cohen of the danger of any sexual assault, let

7    alone assaults on transgender inmates.  And there's a couple of

8    cases that I think are helpful in terms of addressing that

9    point.  *Gonzalez v. Martinez*, 403 F.3d 1179, 1187.  It's a

10   Tenth Circuit decision where the Court held there that

11   evidence of prior nonsexual physical assault, lapses in jail

12   security and sexual harassment and intimidation by guards was

13   sufficient to support a reasonable inference that the defendant

14   in that case was aware of the risk of sexual assaults to

15   sustain an Eighth Amendment indifference claim.

16          So, to the extent that plaintiff shared her concerns

17   and the specifics of the concerns so that there was unfettered

18   access and a lack of supervision, and that the place had become

19   dangerous, combined with the other allegations about prior

20   assaults, even if they weren't sexual assaults necessarily or

21   even if they weren't sexual assaults of transgender inmates, in

22   the Court's view, plaintiff has sufficiently alleged that Cohen

23   knew of and disregarded the excessive risk because there's also

24   the allegation that Cohen basically threw his hands up and

25   said, What do you want me to do?  So, I think that there is

170621manningOA            Argument

1   enough in the complaint to satisfy the second prong as it

2   relates to Cohen.

3          Regarding Ladenhauf, what plaintiff alleges is that at

4   the time of the assault, Ladenhauf was assigned to patrol the D

5   and E housing unit and that he was the primary security staff

6   person responsible for patrolling and providing general

7   security in sublevel E.  And as I mentioned, there's the

8   allegation that he would sign the logbook indicating that he

9   had walked through the area.  He typically did this at 9:00 in

10  the morning and he would remain in the area for a couple of

11  minutes, but he didn't always return to patrol the sublevel E

12  in the afternoon.  And he didn't always sign the logbook in the

13  afternoon or during the afternoon hours.

14         And you know, plaintiff makes the allegation, which is

15  really an inference from some of the other allegations, that

16  because he was the primary security person responsible for

17  sublevel E security, that it's a fair inference that he would

18  have been aware of any assaults that took place in sublevel E,

19  even if he wasn't working at the time of the assaults.  And I

20  think that's a fair inference that can be drawn under the

21  circumstances, especially when the allegation is that there was

22  a pattern of assaults.

23         Also, there was, and I mentioned this earlier, there's

24  sufficient evidence that Ladenhauf was certainly aware of

25  plaintiff's transgender status, as well, by the way, of her

170621manningOA          Argument

1   other medical issues and knew that plaintiff was assigned to

2   work there.  And so what plaintiff says is, add it all up, you

3   have an individual who is aware of plaintiff's heightened risk,

4   is aware of the lack of security because he's the one

5   responsible for the lack of security and presumably is aware of

6   the things like the lack of any surveillance cameras and

7   whatnot, that he was aware of prior assaults and that he

8   nonetheless did not take any reasonable measures or, in

9   plaintiff's view, any measures to abate the harm, the specific

10  harm that was faced by plaintiff.  In the Court's view, those

11  allegations are sufficient.

12          With regard to Griffin, the allegation is that Griffin

13  knew about the lack of adequate supervision in sublevel E.

14  Again, some of this is from the allegations of the pattern of

15  prior assaults that was met with temporary changes in the

16  security protocols, but they weren't permanent to which

17  evidences both knowledge, but a lack of commitment to adopt any

18  security protocols, certainly any protocols that were meant to

19  address plaintiff's unique security risks.  And there are cases

20  that say that such knowledge is sufficient.  So, for example,

21  *Taylor v. Zerillo*, 2008 WL 4862690, at *4, it's an Eastern

22  District decision, where there the Court found that the fact

23  that the defendant knew that a housing block was short-staffed,

24  but nonetheless failed to adjust the staffing levels suggests

25  that that defendant was directly involved because he was

170621manningOA              Argument

1   responsible for the policy that fostered the violation at

2   issue.  And it's also telling that plaintiff makes this

3   allegation, and it's a smart thing to include, so, for example,

4   what plaintiff alleges is that the library actually was located

5   in the sublevel area prior to plaintiff's arrival at Sullivan,

6   but then it had to be moved because inmates had engaged in

7   prohibited behavior there, including sexual activity.  So in

8   order to maintain the security at the library, it was moved at

9   a location outside the sublevel.  So there you have an example

10  of where there was a problem and measures were taken to address

11  the problem.  And here, you have, from plaintiff's perspective,

12  evidence that there was a problem in sublevel E, that there

13  were only temporary measures taken, unlike the library, and

14  that shows both knowledge and indifference to plaintiff's

15  security risks.

16        Now, what the defendants argue is that there's no

17  allegation that Griffin was aware of the alleged prior sexual

18  activity and the sexual assaults in the sublevel area.  Again,

19  the allegation is to the contrary with regard to the temporary

20  measures being adopted and whether or not there were any prior

21  assaults on transgender inmates is really not the bar that

22  plaintiff has to meet in order to establish the second prong

23  for reasons I've already explained.

24        The bottom line is that plaintiff alleges that Griffin

25  was aware that plaintiff worked in sublevel E; that because of

170621manningOA            Argument

1  his title and his job responsibility, he was the one

2  responsible for enforcing the security policies and managing

3  those policies and procedures and changing them, if necessary,

4  to address security needs; that he was, in his position, aware

5  that there were, for example, no cameras in sublevel E as

6  opposed to in other areas; he would be aware of the sightline

7  issues that plaintiff had identified; and he would have been

8  aware of any prior assaults that took place in sublevel E as he

9  was in charge of managing the day-to-day security at the

10 facility.

11        So, add it up altogether, the Court's finding or

12 conclusion is that plaintiff has sufficiently alleged that

13 Griffin could be liable for the Eighth Amendment violations

14 that plaintiff includes in the complaint.

15        Barlow:  The allegation is that he was the sergeant

16 assigned to the program area that included sublevel E, that he

17 was responsible for supervising the officers and prisoners in

18 the area, that as a result of those responsibilities, he would

19 have been aware of the camera issue, he would have been aware

20 of the rounds that were being conducted or not being conducted

21 in the area, he'd be aware of the physical layout, he's the one

22 that would be responsible for reading the logbooks.  All of

23 this is included in paragraph 9 of the second amended

24 complaint.  So, therefore, he would be aware, for example, of

25 Ladenhauf's failure to conduct the afternoon rounds as this

170621manningOA                 Argument

1   would have been indicated in the logbook.  And as I noted

2   earlier, plaintiff alleges that Barlow was aware that plaintiff

3   was assigned to work in sublevel E.

4          So, that combined with Barlow's responsibilities and

5   therefore knowledge of the lapses in security, and because of

6   his supervisory role, knowledge of the prior incidents in

7   sublevel E at this stage plausibly state a claim against

8   Barlow.

9          Urbanski is a closer call because Urbanski -- the main

10  thing about Urbanski that's alleged as it relates to plaintiff

11  was that Urbanski was the individual who was assigned to

12  investigate the harassment that plaintiff suffered as a result

13  of conduct by corrections officers, not other inmates.  And the

14  allegation is that he inadequately addressed these incidents.

15  And the allegation is that -- and they're citing experts, but

16  as we talked about earlier, I'm not sure the plaintiff needed

17  to do that, but to the extent that somebody in plaintiff's

18  position who presents a unique security risk, and if inmates

19  understand that corrections officers get away with harassing

20  such inmates, that other inmates will model that behavior.  And

21  there are some issues with that.

22         I mean, it's not entirely clear from the complaint

23  that the inmates were aware of the harassment that plaintiff

24  says she suffered as a result of corrections officer

25  misconduct, that they were aware of the inadequate

1   investigation, so they would have been aware that it was open

2   season.  I think plaintiff has a hard time making a link

3   between the alleged failure to investigate a corrections

4   officer incident and what Williams did.  While I understand the

5   conceptual link, I think there may be some factual gaps.

6        But plaintiff also alleges that Urbanski was

7   responsible for overseeing the sergeants and corrections

8   officers; that he was responsible for dealing with prisoner

9   complaints, including complaints regarding safety concerns; and

10  as a result, that puts him in position to be aware of the prior

11  activity in sublevel E, to be aware of the protocols that were

12  adopted in sublevel E.  And as I had already mentioned, he was

13  aware of the fact that plaintiff worked in sublevel E and was

14  aware of plaintiff's transgender status.  So, I think plaintiff

15  has plausibly alleged a claim as to Urbanski as well.

16       I haven't really addressed plaintiff's allegations

17  regarding what defendants knew about Williams.  I think it

18  suffices to say at this point that because plaintiff has

19  alleged enough about the defendants' knowledge of plaintiff's

20  status, the fact that she was at a unique risk, and everything

21  I've already mentioned regarding the second prong, from

22  plaintiff's perspective, this may be additive, and it may be,

23  but I don't think it's essential to plaintiff's case.

24       So taking all the allegations as the Court must at

25  this stage, as being true, the Court finds and concludes that

170621manningOA            Argument

1    plaintiff has plausibly stated a claim as to each of the

2    defendants, so the motion is denied.

3            And I don't have to therefore address the

4    not-so-difficult issue about whether or not the plaintiff

5    should be allowed to amend again, because I would have agreed

6    with the defendants this time.

7            Discovery.  If you want, I can let you all talk and

8    you want to just send a proposed discovery schedule in the next

9    week.

10           Is that a fair thing to do?

11           MR. HARTOFILIS:  Yes, your Honor, because we weren't

12   prepared --

13           THE COURT:  I understand.

14           MS. HARTOFILIS:  -- to cover this today.

15           THE COURT:  That's why I don't want to, like, make it

16   up now as we go along.

17           MS. HARTOFILIS:  Can we ask how much time your Honor

18   is inclined to give us for discovery in this case?

19           THE COURT:  So, standard fare is 120 days.  Everybody

20   always has excuses ranging from "I'm really busy" to "this is a

21   complicated case."  My favorite is, "Well, it's summertime,"

22   and then in the fall I get "It's holiday time."  And I guess we

23   all work only, like, five months a year.  The lawyers in this

24   room are not people who are susceptible to that kind of

25   excuse-making, but I have heard those excuses.

170621manningOA            Argument

1          MS. HAZELDEAN:  Your Honor, I'm actually about to
2   leave for vacation.  If we could have a little more time to put
3   together --
4          THE COURT:  Sure.  How much time do you want?
5          MS. HAZELDEAN:  -- that would be preferable for me.
6          Could we make it three weeks instead of one?  I'm
7   leaving, and I'm going to be away for two weeks.  I come back
8   after the July 4th weekend.
9          THE COURT:  Three weeks, but I therefore think we can
10  get the fact discovery done sometime in the -- I guess that
11  would put us in the, like, late fall.  And I don't know, are
12  there going to be experts?  It sounds like there might be.
13         MS. HAZELDEAN:  Yes, I believe so.
14         THE COURT:  So, maybe the experts get done by either
15  the very end of the year or early part of next year, but
16  through nobody's fault, the case has some age to it, so let's
17  try to make up the time with the discovery phase.
18         So, three weeks from today, then, would be the
19  proposed discovery schedule?
20         MS. HAZELDEAN:  Yes, your Honor.
21         THE COURT:  Okay.  And then I'll refer the case to the
22  magistrate judge to supervise discovery should there be any
23  spats.
24         Anything else?
25         MS. HAZELDEAN:  Not at this time.

170621manningOA              Argument

1        THE COURT:  As always, I thank you all for your

2   advocacy.  As I said, this is obviously a very tough case, but

3   not made tougher by the lawyering, just the opposite.

4        So, I thank you all, and I bid you a pleasant vacation

5   and the rest of the day.

6        MS. HAZELDEAN:  Thank you, your Honor.  I appreciate

7   that.

8        MR. HARTOFILIS:  Thank you, your Honor.

9              - - -

10  Certified to be a true and correct

11  transcript of the stenographic record

12  to the best of my ability.

13  _____

    U.S. District Court
14  Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25